# United States Court of Appeals
## For the First Circuit

Nos. 00-2535
     00-2587
     00-2589
     01-1002
     01-1073
     01-1091
     01-1561

UNITED STATES OF AMERICA,

Appellee,

v.

RADMEN DOWNS-MOSES, RAMÓN SÁNCHEZ-HERNÁNDEZ,
RAÚL SALAZAR-URIANA, GERÓNIMO AMPARO-HERNÁNDEZ,
LARRY WARD-BRYAN, and JERRY WARD-O'NEILL,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

Raymond L. Sánchez Maceira for appellant Radmen Downs-Moses.
Rafael F. Castro Lang for appellant Ramón Sánchez-Hernández.
William A. Gilmore, Jr., with whom Azzarito & Gilmore, LLP
was on brief, for appellant Raúl Salazar-Uriana.
Jean Philip Gauthier for appellant Gerónimo Amparo-
Hernández.
H. Ernest Stone for appellant Larry Ward-Bryan.

Terrance J. McCarthy for appellant Jerry Ward-O'Neill.

Nelson Pérez-Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, were on brief, for appellee.

May 27, 2003

**HOWARD**, **Circuit Judge**.  In these consolidated appeals, six defendants challenge their convictions and sentences for aiding and abetting the possession of cocaine with intent to distribute. After a careful review of their arguments, we affirm.

## I.   Factual and Procedural Background

We recite the pertinent facts in the light most favorable to the verdict, see United States v. Valerio, 48 F.3d 58, 60 (1st Cir. 1995)(citing United States v. Ortiz, 23 F.3d 21, 23 (1st Cir. 1994)), deferring some details to our analysis of the issues raised on appeal.

A.        One Boat, Twenty-Eight Bales, and Six Men Adrift

On December 26, 1998, at approximately 10:30 a.m., a U.S. Customs pilot patrolling the waters off the west coast of Puerto Rico and monitoring a marine emergency radio channel learned that a vessel had capsized approximately seven and a half nautical miles west of Cabo Rojo, Puerto Rico.  Aided by coordinates provided by a civilian vessel in the area, the pilot located an overturned vessel, a twenty-one-foot Grand Prix with a yellow fiberglass hull.[1]  The vessel was registered in Puerto Rico, and known by the

---

[1]After locating the vessel and determining there were no survivors in the immediate vicinity, the pilot circled the area within a five- to ten-mile radius.  Because it was a clear, sunny day and the water was calm, the pilot and his co-pilots opted to look for survivors without the aid of infrared equipment or other devices.  None of the Customs pilots noticed the defendants in the water during their visual inspection.

name "MARINATHA."[2]  Agents of the U.S. Coast Guard later arrived at the scene by boat.  The agents inspected the MARINATHA and, upon righting the vessel, discovered five bales of a substance later identified as cocaine.  The bales were rectangular parcels wrapped in brown burlap bags with red and green stripes.  Inside, the cocaine was packaged in bricks, with each brick tightly wrapped in thick balloons of various colors.

Some distance north of the MARINATHA (the record is unclear as to the location), a Coast Guard pilot discovered twenty-one bales floating in the water.  A U.S. Border Patrol boat responded to a call for assistance and recovered these bales, also later determined to contain cocaine, which were wrapped in the same manner as those recovered with the MARINATHA.

In the early afternoon, agents with the maritime drug interdiction unit of the Police of Puerto Rico (known as "FURA"), acting on information received via police communication radio, went to yet a third location in the water.  Approximately five miles west of Boquerón, Puerto Rico, FURA agents discovered floating in the water defendants-appellants Jerry Ward-O'Neill ("Ward-O'Neill"), his brother Larry Ward-Bryan ("Ward-Bryan"), and Raúl Salazar-Uriana ("Salazar").  The three men wore life vests.

---

[2]At trial, all parties stipulated to the fact that none of the six defendants was ever a registered owner of the MARINATHA, registry number PR-2311-AA.  The MARINATHA had been purchased a few weeks prior to December 26, 1998, and was registered in the name of a person who was not charged in this case.

After removing these men from the water, FURA agents spotted three more people floating in the water approximately 200 feet away. One man in this second group, Radmen Downs-Moses ("Downs"), was wearing a life vest identical to the life vest worn by one of the men in the first group. The two other men in this second group, Ramón Sánchez-Hernández ("Sánchez-Hernández") and his cousin Gerónimo Amparo-Hernández ("Amparo-Hernández") were each seen clinging to a burlap-covered bale as a flotation device. As the agents approached, the men pushed the bales away. These bales, also containing cocaine, were wrapped in the same manner as the five bales recovered with the MARINATHA by the Coast Guard and the twenty-one bales recovered by the Border Patrol.

FURA agents also recovered a white bucket floating in the water near where the defendants were found. The bucket contained, among other things, a cellular telephone,[3] a protective case for a global positioning system, razor blades labeled "Gillette of Colombia, S.A.," and a laminated piece of paper with writing on it. The notations on the paper included two sets of coordinates (one set of which was close to where the capsized MARINATHA was found), as well as the name "Moreno." FURA agents found no fishing or diving gear in the vicinity.

[3]According to a stipulation entered into at trial, the telephone number corresponding to the cellular telephone had never been assigned to any of the defendants.

The six men were taken to the FURA office in Boquerón and placed under arrest. Customs agents read each his <u>Miranda</u> rights, and each signed a written waiver. In the interviews that followed, the men told stories that were at times incredible and contradictory. The three men in the first group, all Colombian nationals, claimed to know each other, but denied knowing anyone in the second group. Ward-O'Neill claimed that he and the other two in the first group had been near Puerto Rico for twenty-four days on the ALEXANDER,[4] allegedly a forty-two-foot fishing vessel under the command of one Captain Alejandro. He said that he and seven others (including Ward-Bryan and Salazar) went out on a smaller twenty-foot fishing boat that had engine problems and capsized. He could not identify any of the other people who had been with them in the smaller boat. He denied knowing the men in the second group picked up by FURA, or knowing anything about the nearby bales of cocaine.

Ward-Bryan told a similar story, but could not recall the name of the forty-two-foot vessel on which he had been a passenger for twenty-four days. Salazar's version of the story differed -- he stated that a total of five people boarded the smaller boat, and that they had done so because the larger vessel was having engine

---

[4]A Customs agent testified at trial that he, like agents of the Coast Guard, Border Patrol, and FURA working in the area on December 26, 1998, did not see any vessels fitting the alleged description of the ALEXANDER in the vicinity.

problems, not to go fishing. According to his story, the small boat capsized when its passengers attempted to tow the larger vessel. They then tried to swim back to the larger vessel to be rescued, but it abandoned the three of them (but apparently not the other passengers who had been in the small boat) in the water before they could reach it.

In the second group, Sánchez-Hernández, a Dominican national residing in Puerto Rico, told agents that he and his cousin left to go fishing in a small boat the previous evening. He said their boat took on water and sank that night at approximately 10:00 or 10:30 p.m. He denied knowing any of the four other men picked up in the water or even where they had come from, but stated that if any of the other men said he was on "the yellow boat," then that person was lying. Sánchez-Hernández admitted that he was known by the nickname "Moreno," a name that appeared on the piece of paper found in the white bucket. His cousin, Amparo-Hernández, told a similar story, but said their fishing boat had hit a rock, and that this was what caused it to sink. Despite being found using a bale of cocaine to keep him afloat, Amparo-Hernández denied having any knowledge of the bales found with him and Sánchez-Hernández.

The third person in the second group was Downs, a Nicaraguan national who claimed not to know any of the other men found at sea. He told the agents that he had been a stowaway on a

Costa Rican container ship, and that when he was discovered on board the day before, the captain put a life vest on him, brought the ship close to the coast of Puerto Rico, and threw him overboard. Downs identified for the agents the life vest he had been wearing, and signed the life vest in their presence. The life vest was identical to one of the life vests worn by one of the men in the first group.

On December 30, 1998, a grand jury indicted the six men on a single count of aiding and abetting each other in knowingly, intentionally, and unlawfully possessing with intent to distribute approximately 978 kilograms of cocaine on board a vessel of the United States, in violation of 46 U.S.C. app. § 1903(a),(b)(1) and (f), and 18 U.S.C. § 2.

B.      Trial and Sentencing

The defendants were tried before a jury in April 2000, with testimony offered over the course of six days. In addition to evidence introduced by the government, the parties stipulated that the chain of custody of the evidence recovered on December 26, 1998 would be completed through the testimony of certain identified law enforcement agents. They also stipulated that a forensic chemist would testify to the fact that the bales contained cocaine

hydrochloride (a Schedule II narcotic), weighing a total of 975 kilograms, and having a strength or purity of 83 percent.[5]

On April 11, 2000, the district court read closing instructions to the jury in open court. Among other things, the jury was instructed that only a "measurable amount" of cocaine must be proven by the government beyond a reasonable doubt, not the actual amount charged in the indictment. Although this stage of the proceedings was not recorded by the court reporter, the exchange between the court and counsel immediately thereafter was transcribed, and reflected that the court gave defense counsel the opportunity to object to the instructions. Other than an objection by counsel for Ward-Bryan on the ground that the minimum and maximum penalty should have been read to the jury (a request denied

---

[5]This stipulation read, in relevant part:

It is hereby stipulated and agreed to by the United States and the above-captioned defendants with advice of their respective attorneys that Juan C. Bruna, forensic chemist of the Drug Enforcement Administration would testify as follows:

1. That he received drug exhibits in this case . . . from Special Agent Marco Rocco of the United States Customs Service in three sealed boxes containing samples of kilograms taken from 28 different bales and placed in three sealed boxes;

2. That he opened said boxes and performed a chemical analysis of the samples submitted which reveals the following: Drug weight of seizure 975 kilograms. Net weight 852.2 kilograms. Strength or purity 83 percent;

3. That cocaine hydrochloride is a Schedule II narcotic drug controlled substance.

by the district court), counsel made no objections to the jury instructions.

The jury returned verdicts of guilty as to all defendants. Sánchez-Hernández and Amparo-Hernández were each sentenced to a term of imprisonment of 200 months; Ward-Bryan and Ward-O'Neill (following a 2-point adjustment in his base offense level on re-sentencing in March 2001) were sentenced to 188 months; Salazar was sentenced to 180 months; and Downs was sentenced to 172 months. All defendants were sentenced to supervised release terms of five years, and assigned special monetary assessments of $100. These appeals followed.

## II. Analysis

On appeal, the defendants challenge the sufficiency of the evidence presented at trial.[6] Three of the defendants (Ward-Bryan, Sánchez-Hernández, and Amparo-Hernández) criticize the use of the stipulation at trial that described the government chemist's testimony regarding the nature and weight of the drug evidence,

---

[6]Ward-O'Neill, the only defendant who did not raise this issue in his principal brief on appeal, adopted the issue in a pro se supplemental brief by reference to the briefs of co-defendants Ward-Bryan and Salazar. Most of the defendants attempted to incorporate by reference the arguments of general application made by their co-defendants. Finding the arguments raised on appeal unavailing, we do not address whether the defendants' attempts at incorporation were effective. See, e.g., United States v. David, 940 F.2d 722, 737 (1st Cir. 1991)("Adoption by reference . . . cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case.").

although each frames the issue differently on appeal. Ward-O'Neill alleges that he was denied due process of law because the jury charge was not transcribed by the court reporter, and that the district court erred in failing to grant him a greater reduction in sentence based on his role in the illegal venture. Downs alleges that his post-arrest statement should have been suppressed at trial, that he was denied the right to a public trial, that the prosecution indirectly referenced his failure to testify at trial, and that he was denied effective assistance of counsel.

A.          Sufficiency of the Evidence

The defendants contend that their convictions should be vacated because the evidence presented at trial was insufficient to support their guilty verdicts. In reviewing such a challenge, we consider the record evidence (and any reasonable inferences therefrom) as a whole and in the light most favorable to the prosecution, asking whether the evidence would have permitted a rational jury to find the defendants guilty of the crime charged beyond a reasonable doubt. United States v. Lopez-Lopez, 282 F.3d 1, 19 (1st Cir. 2002); Ortiz, 23 F.3d at 24.

In so doing, we do not favor direct evidence over circumstantial evidence, as either type of evidence may satisfactorily support a conviction. See Ortiz, 23 F.3d at 24; see also United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993)("A conviction may be premised in whole or part on

circumstantial evidence."). Nor do we weigh the evidence or judge credibility; these determinations are the province of the jury. See Mena-Robles, 4 F.3d at 1031. A verdict that is "supported by a plausible rendition of the record" will not be disturbed on appeal. United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

The defendants argue that the case for a finding of innocence is at least equally as compelling as the case for a finding of guilt, and thus reversal of their convictions is mandated. See United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)(quoting United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992)(conviction cannot stand if evidence provides "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence on the crime charged")). We disagree.

The indictment charged the defendants with aiding and abetting, on board a vessel of the United States, the possession with intent to distribute approximately 978 kilograms of cocaine. See 46 U.S.C. app. §§ 1903(a), (b)(1). To prove aiding and abetting, the government must demonstrate that each defendant participated in the illegal venture and sought by his actions to make it succeed. United States v. Guerrero, 114 F.3d 332, 341 (1st Cir. 1997). "Mere presence at the scene or even knowledge that the crime is being committed is generally insufficient to establish aiding and abetting." Id. at 342.

The government's evidence at trial was persuasive, particularly when viewed in its totality. Ortiz, 966 F.2d at 711 ("[J]uries are not required to examine the evidence in isolation, for individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)(internal quotation omitted)). Contrary to the defendants' contentions on appeal, the jury could have inferred far more than the defendants' "mere presence" at the scene of the crime.

On the evidence presented, a reasonable jury could have found that all twenty-eight bales of cocaine, elaborately and similarly packaged, had been part of the same shipment; that the size of the shipment (weighing 975 kilograms, or more than 2100 pounds) necessitated that a number of individuals participate in its transport; that the six defendants had been aboard the MARINATHA with the contraband; and that the MARINATHA was a vessel of the United States.

Further, the jury could have credited the testimony of the Customs agent who interviewed the defendants, including his description of the stories told by the defendants and the inculpatory comment by Sánchez-Hernández that if any of the other

men said he was in "the yellow boat," he was lying.[7]  The jury could have rejected the defendants' stories as fabricated, concluding that each defendant was attempting to conceal his active participation in a venture he knew to be illegal.  This type of concealment may have further incriminated the defendants:[8]

> [T]he jury could certainly have chosen to believe that the converging circumstances pointed toward a more sinister truth and been persuaded thereby of appellants' guilt.  And that conclusion, once reached, would be self-reinforcing; if the jury disbelieved defendants' story, it could legitimately have presumed that the fabrication was all the more proof of their guilt.

United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989).  On these facts, we cannot say that the jury's conclusion was irrational.  See, e.g. United States v. Corchado-Peralta, 318 F.3d 255, 258 (1st Cir. 2003).

---

[7]For a jury to credit the defendants, it would have had to believe that the defendants encountered each other in the sea by serendipity.  The jury would have to believe that two unrelated fishing boats sank near each other for reasons inconsistently described by the members of the purported fishing parties; that one of the groups of fishermen had the misfortune of drifting alongside two bales of cocaine wrapped in the same manner as some bales floating near a capsized boat a few miles away; that near the two groups floated a bucket nobody knew about, but which contained known tools of the drug trade and a paper bearing (1) the nickname of one of the men, and (2) the coordinates of a location very near the capsized, drug-laden boat; and that a sixth unlucky stranger passing through on a container ship was outfitted with a life vest identical to one worn by one of the other fishermen floating in the water, and thrown overboard in that same location.

[8]Even if Downs's statement was disregarded, there was, as discussed below, sufficient evidence to convict him.

B.          Stipulation Relating to Drug Amount

Three of the defendants contend that the stipulation regarding the testimony of the government's forensic chemist was used improperly at trial.  Each of these defendants attempts to draw on the principles set forth in  Apprendi v. New Jersey, 530 U.S. 466 (2000).  Apprendi stands for the proposition that, other than a fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must both be charged in the indictment and submitted to a jury for a determination under the beyond-a-reasonable-doubt standard." United States v. Eirby, 262 F.3d 31, 36 (1st Cir. 2001)(citing Apprendi, 530 U.S. at 490).  Ward-Bryan makes an express Apprendi claim, alleging that weight of the cocaine involved should have been submitted to the jury.  Without referencing Apprendi directly, Sánchez-Hernández argues that the stipulation was used in a manner that violated his rights to due process and a jury trial, and Amparo-Hernández alleges that he was denied effective assistance of counsel in connection with the stipulation.

1.          Apprendi (Ward-Bryan)

Ward-Bryan alleges that because his sentence was based on the weight of the cocaine involved in the crime, the failure to submit this issue to the jury for determination beyond a reasonable doubt violated his rights under Apprendi.  Having failed to object to his sentence on this basis, Ward-Bryan's argument is reviewed on

appeal for plain error only.  United States v. Olano, 507 U.S. 725, 731-32 (1993).  Accordingly, Ward-Bryan bears the burden of proving (1) an error, (2) that is plain, and (3) that affects substantial rights.  Johnson v. United States, 520 U.S. 461, 466-67 (1997)(quoting Olano, 507 U.S. at 732).  Even if he meets this burden, this court will only exercise its discretion to notice the error if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. at 467.

The indictment specified that approximately 978 kilograms of cocaine were involved in the crime, a charge that exposed Ward-Bryan to a sentence of ten years to life.  See 46 U.S.C. app. § 1903(g)(1); 21 U.S.C. § 960(b).  He concedes in his brief that he stipulated at trial that the weight of the cocaine was 975 kilograms (an amount carrying the same penalties as the amount charged in the indictment) and that this may have been a tactical decision intended to limit juror prejudice by avoiding "prolonged testimony focusing on the contraband itself."[9]

---

[9]Ward-Bryan now contends that it is "entirely likely" that the stipulation to the drug amount (entered into in April 2000, prior to the Apprendi decision in June 2000) was made with the expectation that, consistent with then-existing practice, the jury would be instructed that it need not make a determination as to the quantity of cocaine involved.  Thus Ward-Bryan would have had less of an incentive pre-Apprendi to dispute the drug quantity in front of the jury.  Ward-Bryan now wishes to be relieved of the consequences of the stipulation (which he acknowledges may have provided some tactical advantage to him at trial).  The failure to submit this stipulated issue to the jury does not constitute an "error."

Ward-Bryan has not demonstrated any error on these facts. He was sentenced to 188 months' imprisonment, a term less than the statutory maximum (in this case, a life sentence). In such a case, "Apprendi is irrelevant." Eirby, 262 F.3d at 37. Ward-Bryan concedes this point in his brief, but urges us to find that Apprendi extends to circumstances in which a defendant is sentenced to more than the mandatory minimum sentence. This suggested expansion of Apprendi is wholly inconsistent with our precedent, see United States v. Newton, --- F.3d --- , No. 01-2636, 2003 WL 1826135, at *11 (1st Cir. Apr. 9, 2003); Lopez-Lopez, 282 F.3d at 22; United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001), and we are not empowered to revisit the issue. See United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991)("[I]n a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent."). We find no error in Ward-Bryan's sentencing.

2.      Erroneous Jury Instruction (Sánchez-Hernández)

In his pro se supplemental brief, Sánchez-Hernández also alleges that the stipulation regarding the forensic chemist's testimony was used in a manner that violated his rights, referring generally to his right to due process and to his Sixth Amendment right to a speedy and public jury trial. Sánchez-Hernández argues that he stipulated only to what the forensic chemist would testify

-17-

to, not to the accuracy of the witness's testimony. He contends that the district court erred in (1) failing to explain this distinction to the jury, and (2) affirmatively misstating the effect of the stipulation to the jury. The latter alleged error occurred immediately after the stipulation was read to the jury when the district court instructed the jury:

> Let me advise the jury first that the United States and the defendants having stipulated to the facts as stated in that stipulation, <u>those facts stated in that stipulation as to the drug are facts that must be taken as true</u> not subject to credibility.

Tr. Apr. 4, 2000, 28:1-5 (emphasis added). Sánchez-Hernández made no contemporaneous objection to either alleged error, nor did he later request jury instructions or a form of verdict that would require the jury to determine the amount of cocaine involved beyond a reasonable doubt. Having failed to preserve these issues at trial, Sánchez-Hernández's arguments are reviewed for plain error. <u>Olano</u>, 507 U.S. at 731-32.

Although Sanchez-Hernandez's argument may be technically correct that he stipulated to only the chemist's testimony about the drugs, and the district court therefore erred in characterizing the stipulation as a stipulation "as to the drug[s]," this error did not affect Sánchez-Hernández's substantial rights. As a factual matter, the defendants and their counsel treated the

-18-

stipulation as a stipulation to the quantity of cocaine,[10] and no other evidence was presented that would have contradicted the testimony of the government's forensic chemist. As a matter of law, because Sánchez-Hernández was sentenced to less than the statutory maximum, the failure to present the issue of the drug amount to the jury has no constitutional significance.[11] See Apprendi, 530 U.S. at 490; see also Section II.B.1., above.

### 3. Ineffective Assistance of Counsel (Amparo-Hernández)

Amparo-Hernández contends that he received ineffective assistance of counsel, both at the time he entered into the defendants' stipulation, and at the time counsel failed to object to jury instructions that did not require the jury to determine the

---

[10]Prior to sentencing, Sánchez-Hernández, Amparo-Hernández, and Salazar each moved for a new trial or for sentencing at the mandatory minimum, alleging a violation of Apprendi because the amount of drugs involved was not determined by the jury. At their sentencing hearings on October 27, 2000, these defendants, through counsel, withdrew their motions after reviewing a copy of the stipulation regarding the testimony that would be offered by the government's forensic chemist. Similarly, at Downs's sentencing (which occurred three days before), Downs's counsel reviewed the motion filed on behalf of Sánchez-Hernández and asked that the same issues be preserved for his client. He later conceded, however, that the drug amount "was agreed and stipulated."

[11]Sánchez-Hernández also argues that the district court erred in instructing the jury that it need not determine the amount of cocaine as charged in the indictment. This argument is identical in all relevant respects to the Apprendi argument made by Ward-Bryan, and is rejected for the reasons discussed in Section II.B.1., above.

-19-

drug amount beyond a reasonable doubt.[12]  Typically we do not consider claims of ineffective assistance of counsel on direct appeal.  United States v. Soldevila-Lopez, 17 F.3d 480, 485 (1st Cir. 1994).  Such claims usually present mixed questions of law and fact, and should be addressed at the district court level in the first instance.  See id.  Here, however, the key facts are not in dispute, the record appears "sufficiently developed to allow a reasoned consideration" of Amparo-Hernández's claim, and both sides contend that further factfinding is unnecessary.  United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991).  Accordingly, we consider Amparo-Hernández's claim of ineffective assistance.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at trial.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To demonstrate a violation of this right, a defendant must show that counsel's performance was constitutionally deficient and that prejudice resulted.  See id. at 687.  The first prong of the analysis, the "performance" prong, is

---

[12]These are the only claims of ineffective assistance discussed in any detail in Amparo-Hernández's brief, although he makes references, not developed on appeal, to the fact that (1) counsel failed to adequately inform him of his rights and the consequences of the drug stipulation (Amparo-Hernández Br. at 19); and (2) the stipulation "was forced upon the defendant" (Amparo-Hernández Br. at 26).  These types of fact-based allegations are not suitable for consideration on direct review.  See United States v. Gonzalez-Vazquez, 219 F.3d 37, 42 (1st Cir. 2000).  Accordingly, our disposition of Amparo-Hernández's remaining ineffective assistance arguments is without prejudice to Amparo-Hernández raising these two fact-based allegations in a motion for relief under 28 U.S.C. § 2255.

applied with deference to counsel's professional judgment, and is based on what counsel knew or should have known at the time counsel exercised such judgment. See Natanel, 938 F.2d at 309. Counsel's performance will be deemed deficient only if, considering all relevant circumstances, counsel's conduct or omissions fell "outside the wide range of professionally competent assistance." See Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002)(quoting Strickland, 466 U.S. at 690).

Amparo-Hernández's claim fails at the first prong of this analysis. Accepting Amparo-Hernández's characterization of the stipulation as one in which he agreed to the quantity of cocaine at issue (and not a mere agreement to the forensic chemist's testimony, as Sánchez-Hernández suggests on appeal), this stipulation spared the defendant the spectacle of twenty-eight bales of cocaine on parade before the jury. This was an approach apparently agreed to by all of the defendants, who devoted their defense to disputing the connection between the defendants and the cocaine without highlighting the amount of contraband involved. Under the circumstances, this was a reasonable tactical decision. Similarly, no objection to the related jury instruction would have been appropriate in light of the stipulation as it was understood by the defendants and their counsel at the time. Amparo-Hernández has demonstrated no deficiency in counsel's performance on these facts.

C.        <u>Transcription of Jury Charge (Ward-O'Neill)</u>

Ward-O'Neill contends that he was denied due process of law because the jury charge was not transcribed, and that his conviction should be reversed because this gap in the transcript deprived him of the opportunity to seek review of the jury instructions for substantial error.  But "due process does not automatically require reversal when a defendant is denied a full verbatim transcript."  <u>United States</u> v. <u>Brand</u>, 80 F.3d 560 (1st Cir. 1996) (citing <u>Bundy</u> v. <u>Wilson</u>, 815 F.2d 125, 135 (1st Cir. 1987)).  Here, Ward-O'Neill and his co-defendants do not dispute that they were provided written copies of the jury instructions, that the district court read from them, and that all counsel were afforded the opportunity to make objections on the record.  There has been no due process violation under these facts.[13]  See <u>Bundy</u>, 815 F.2d at 135 ("A defendant's right to a transcript can be satisfied by providing him with a written substitute that reports

---

[13]Although raised for the first time only in Ward-O'Neill's reply brief and therefore not considered on appeal, <u>see</u> <u>Rivera-Muriente</u> v. <u>Agosto-Alicea</u>, 959 F.2d 349, 354 (1st Cir. 1992), the failure to transcribe any portion of the proceedings in open court is inconsistent with the requirements of the Court Reporters Act, 28 U.S.C. § 753(b)("Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges <u>shall be</u> recorded verbatim . . . ")(emphasis added). Technical noncompliance, without more, does not give rise to reversible error, but there could be cases in which prejudice results.  The practice of not transcribing the instructions as actually given is inadvisable.

-22-

the portions of the trial which underlie his appellate contentions.").

D.      Sentencing (Ward-O'Neill)

Ward-O'Neill challenges his sentence, alleging that he should have received a greater reduction in his offense level under the federal sentencing guidelines than the two-level reduction as a "minor" participant he received at a re-sentencing held in March 2001.[14]  See U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 3B1.2(a) (2002).  Specifically, Ward-O'Neill claims he was entitled to a four-level reduction as a "minimal" participant, see U.S.S.G. § 3B1.2(b), on the ground that there was no evidence at trial that he did anything more than off-load drugs from another vessel.  In challenging the fact-based determination as to his role in the offense, Ward-O'Neill bears the burden of proving that the district court's determination was clearly erroneous.  United States v.

---

[14]In a crime involving multiple participants, a district court may decrease a defendant's offense level by two to four levels if the defendant had a mitigating role in the offense.  U.S.S.G. § 3B1.2.  A four-level reduction may be granted for a "minimal participant," which is defined as someone who is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment (n.4).  A defendant may fit in this category if he is shown to lack "knowledge or understanding of the scope or structure of the enterprise and of the activities of others." Id. A two-level reduction is available for those who are also less culpable, "but whose role could not be described as minimal."  Id. (n. 5).  For those defendants falling between "minimal" and "minor," a three-level reduction is available. Sánchez-Hernández, Amparo-Hernández, and Ward-Bryan each received two-level reductions in their offense level; Salazar and Downs received three-level reductions.

<u>Murphy</u>, 193 F.3d 1, 8 (1st Cir. 1999) ("This is normally a fact-bound decision, reviewed only for clear error and rarely reversed."); <u>United States</u> v. <u>Gonzalez-Soberal</u>, 109 F.3d 64, 73 (1997); <u>United States</u> v. <u>Ocasio</u>, 914 F.2d 330, 332-33 (1st Cir. 1990).

Ward-O'Neill did not present evidence that he had a minimal role in the offense. In fact, during his testimony at trial, he denied having any role at all, for the most part repeating the fishing-trip story he told investigators upon his arrest. The district court found that, because of the size of the cocaine shipment, the size of the boat used, and the number of defendants involved in its transport, the offense involved more than minimal planning, and was not likely to involve "strangers" to the transaction who had no role in the enterprise. Despite these conclusions, the district court gave Ward-O'Neill the benefit of a two-level reduction in his offense level. Ward-O'Neill has not shown that the court clearly erred in declining to grant a four-level reduction, an adjustment that the sentencing guidelines note should be "used infrequently." U.S.S.G. § 3B1.2, comment (n.4); <u>see</u> <u>United States</u> v. <u>Munoz</u>, 36 F.3d 1229, 1238 (1st Cir. 1994).

E.      <u>Waiver of Miranda Rights (Downs)</u>

Downs contends that his post-arrest statement, including his admission that he had been wearing a life vest that matched another defendant's, should have been suppressed on the ground that

his waiver of his rights under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), was not knowingly and intelligently made. Downs raised this issue below in a May 20, 1999, motion to suppress, which was denied by the district court in January 2000 at the recommendation of Magistrate Judge Justo Arenas.

A defendant may make a valid waiver of his rights under <u>Miranda</u> if he does so voluntarily, knowingly and intelligently. <u>Miranda</u>, 384 U.S. at 444; <u>United States</u> v. <u>Palmer</u>, 203 F.3d 55, 60 (1st Cir. 2000). The district court must begin with the presumption that the defendant did not waive his rights. <u>Palmer</u>, 203 F.3d at 60. The government bears the burden of proving a valid waiver by a preponderance of the evidence. <u>See</u> <u>id.</u>; <u>United States</u> v. <u>Rosario-Diaz</u>, 202 F.3d 54, 69 (1st Cir. 2000). We review the district court's factual findings for clear error, <u>United States</u> v. <u>Marenghi</u>, 109 F.3d 28, 31 (1st Cir. 1997), recognizing that if there are two plausible interpretations of the evidence, the district court's choice of one of these interpretations cannot be clearly erroneous. <u>Palmer</u>, 203 F.3d at 60. Conclusions of law, including the determination as to whether a waiver of rights was voluntary, engender de novo review. <u>See</u> <u>id.</u>; <u>United States</u> v. <u>Bienvenue</u>, 632 F.2d 910, 913 (1st Cir. 1980).

The magistrate judge held evidentiary hearings in November and December 1999 and recommended that Downs's motion to suppress his post-arrest statement be denied. In reaching his

-25-

decision, the magistrate judge described the findings of the experts[15] and the testimony of one of the Customs agents who interviewed Downs and witnessed his waiver of his <u>Miranda</u> rights. The magistrate judge focused almost exclusively on the issue of whether Downs's waiver of his rights was voluntary, finding no indicia that his statement was "the product of force, intimidation, or fatigue." As to whether Downs's waiver was knowingly and intelligently made, the magistrate judge observed only that there were "varying opinions in terms of [Downs's] intellectual capacity," and that

> [t]here is enough in his personal history, as well as the embellished saga of the Costa Rican containership and the strangers the defendant found on the high seas, like a scenario from a Clive Cussler novel, to belie the argument that his waiver was not intelligently made.

Even were we to assume <u>arguendo</u> that the district court erred in finding that Downs's waiver was made knowingly and intelligently, the introduction of the confession at trial would

---

[15]The defense expert testified that Downs had an IQ of 61, placing him in the extremely low range of intellectual functioning. She testified that, on an intellectual level, Downs is mentally retarded. She also found that Downs had a limited vocabulary, and did not have the capacity to make a rational choice because he lacked an appreciation of the consequences of his decisions. The government's expert found that Downs's intellectual capacity "seemed average" despite his lack of formal education. She found that Downs's memory and recollection also "seemed average" and that "when lapses were apparent they were more the result of a conscious denial and not a cognitive deficiency." She concluded, however, that under the circumstances, Downs's competency to waive his constitutional rights at the time of his arrest was "questionable."

-26-

constitute a "trial error." Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991). Trial errors -- unlike structural defects in a prosecution, id. at 309-10, such as the total deprivation of the right to trial counsel -- occur during the presentation of evidence to the jury and therefore may be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Id. at 308. In reviewing the evidence, we are mindful that

> the harmless-error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of a defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Id. (internal quotation omitted).

The admission of Downs's post-arrest statement, including his story about being on a Costa Rican container ship and his identification of the life vest he was wearing when he was found at sea, was insignificant in the context of the other evidence presented. Without this statement, the government still had testimony placing Downs in the water beside two defendants afloat on bales of cocaine. The government had five other defendants who gave contradictory explanations regarding how they came to be at sea, and denied knowing most of the other defendants, including Downs. And contrary to representations made by Downs's counsel at oral argument, Downs's post-arrest statement was not the sole

-27-

evidence presented at trial linking Downs to the life jacket he signed; Downs, through trial counsel, volunteered to stipulate that the signature on the life vest was his. The life vest, with a distinctive dolphin logo and brand name, was then shown to the jury, as was a matching life vest worn by one of the other defendants. On these facts, we find that even if an error occurred in admitting Downs's statement, it was harmless.

F.        Other Assignments of Error (Downs)

In a supplemental pro se brief, Downs raises three additional issues that may be readily dispatched. First, Downs alleges a violation of his right to a public trial because, during voir dire, "the jury venire panel filled every seat in the courtroom making it virtually impossible to seat anyone who wasn't a juror." Downs does not reference any portion of the record supporting his claim that the courtroom was ever closed, nor does he contend that this arrangement was ever the subject of an objection or a request for alternative accommodations. Without more, Downs fails to show any violation of his right to a public trial. See, e.g. United States v. Kobli, 172 F.2d 919, 923 (3d Cir. 1949) ("The courts . . . have denied that the constitutional right to a public trial involves the necessity of holding the trial in a place large enough to accommodate all those who desire to attend.").

Second, Downs argues that the prosecution improperly referenced his decision not to testify, citing two exchanges during the cross-examination of Ward-O'Neill by the prosecution. As support, Downs cites questioning directed at whether Downs spoke English and at whether Ward-O'Neill knew Downs (Ward-O'Neill volunteered that he and Downs were held in the same prison pending trial). Downs complains that these questions put him in a position where he felt pressured to testify to explain how he learned English and why he had been incarcerated. In determining whether there has been an improper reference to a defendant's silence, we ask "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Akinola, 985 F.2d 1105, 1111 (1st Cir. 1993)(quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987)). We fail to see how a jury could have drawn any connection between these questions and Downs's silence at trial. That Downs would have liked to give an explanation of his co-defendant's answers (a sentiment no doubt shared by many defendants who choose not to testify) does not render the questions improper nor the questioning constitutionally infirm.

Third, Downs contends that he was denied effective assistance of counsel, alleging that his counsel was assigned to

-29-

his case only fifteen days before trial and that his performance was deficient because he failed to (1) discuss the possibilities of a plea bargain with Downs; (2) seek to plea bargain with the government; or (3) attempt to minimize Downs's sentence through the provision of substantial assistance to the government. Unlike the claims raised by Amparo-Hernández and resolved in this direct appeal, see Section II.B.3., above, Downs's claim is a mixed question of law and fact for which we have virtually no record support. We therefore decline to address this claim on appeal, without prejudice to Downs asserting it in a motion for relief under 28 U.S.C. § 2255.

### III.   Conclusion

For the foregoing reasons, the defendants' convictions and sentences are **AFFIRMED.**