

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0048-19

**THOMAS DIXON, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE SEVENTH COURT OF APPEALS
LUBBOCK COUNTY**

KELLER, P.J., delivered the opinion for a unanimous Court. HERVEY, J., filed a concurring opinion in which KEASLER and NEWELL, JJ., joined.

The Court of Appeals reversed Appellant's conviction for two reasons: (1) because cell phone location information was improperly admitted, and (2) because the trial court deprived him of a public trial. Neither of these reasons appears to stand up to close scrutiny. In this murder-for-hire prosecution, Appellant's whereabouts on a date other than the date of the murder were not particularly important to the case, so any error in admitting the evidence was harmless. As for the public trial complaints, two were not preserved and the other has no merit. Consequently, we reverse the judgment of the court of appeals.

## I. Cell-Site Location Information (CSLI)

### A. The Investigation

Appellant, Thomas Dixon, was a plastic surgeon in Amarillo. Joseph Sonnier was a physician in Lubbock. David Shepherd was a friend of Dixon's. On July 10, 2012, David Shepard killed Joseph Sonnier. The State's theory was that Dixon hired Shepard to kill Sonnier.

The State introduced evidence that Sonnier was dating Dixon's former girlfriend and that Dixon wanted her back. Shepard's roommate testified that Shepard told him that Dixon paid him to kill Sonnier. The State also introduced fifty-five pages of cell phone records that showed numerous phone calls and text messages between Dixon and Shepard in the months leading up to the murder and on the day of the murder. These records also included cell-site location information.

Fifty-one of those pages were from Shepard's cell phone provider. The admissibility of Shepard's phone records is not in dispute. From these records, the State showed that Dixon and Shepard exchanged hundreds of text messages in the months leading up to the murder and that at least some of the messages were about the victim. The day before the murder, Shepard texted, "Perfect day to travel to hub city" and Dixon responded, "Need it done ASAP." They exchanged forty-one text messages on the day of the murder. CSLI from Shepard's cell phone showed Shepard in Lubbock during times when he was communicating with Dixon. It also showed that Shepherd was in Lubbock on March 12, 2012.

CSLI from Dixon's phone showed that he was in Lubbock on March 12, 2012. But the State did not obtain a warrant for the CSLI for Dixon's phone.[1] Dixon had claimed to the police that he

---

[1] The State did obtain a court order for the records, as required by statute. *See* TEX. CODE CRIM. PROC. art. 18.21.

was not in Lubbock on March 12, but at trial, he conceded that he must have traveled to Lubbock because the cell phone records showed him there. Also, a gas-station receipt showed that Dixon had bought gasoline in Plainview on March 12.

Although Dixon had originally told the police that he knew nothing about Sonnier, he admitted at trial that this was untrue. Dixon testified that he had hired Shepard to track and photograph Sonnier (hoping to obtain photos that would cause Dixon's former girlfriend to break up with Sonnier) and that he understood that Shepard would be planting a camera at Sonnier's house for this purpose. Also, Shepard's phone records revealed that Dixon called Shepard within minutes after the police finished speaking to Dixon.

## B. Appeal

Dixon claimed on appeal that the trial court erred in failing to suppress CSLI from his cell phone records. Relying on the Supreme Court's recent decision in *Carpenter v. United States*,[2] the court of appeals agreed.[3] The court of appeals further held that it could not conclude that the error was harmless beyond a reasonable doubt.[4]

In support of its conclusion on harm, the court of appeals observed that the CSLI served two purposes: (1) as circumstantial evidence of Dixon's complicity in the murder (by showing that he and Shepard worked closely together) and (2) to impeach Dixon's testimony.[5] The court of appeals concluded that, "absent the CSLI, there was no evidence appellant ever was in Lubbock with

---

[2] 135 S. Ct. 2206 (2018).

[3] *Dixon v. State*, 566 S.W.3d 348, 363-64 (Tex. App.–Amarillo 2018).

[4] *Id.* at 370-71. *See also* TEX. R. APP. P. 44.2(a).

[5] *Dixon*, 566 S.W.3d at 365-66.

Shepard for *any* purpose."[6]  Although Dixon had purchased gas in Plainview on March 12, the court of appeals concluded that that evidence said nothing about Dixon's contact with Shepard.[7]  The court of appeals further concluded that the CSLI evidence was in a form likely to have a strong impact on jurors.[8]  And the court of appeals concluded that the CSLI formed a main pillar of support for the State's trial argument that Dixon could not be believed.[9]  The court of appeals concluded that Dixon's credibility was important because the jury had to decide what his purpose was in working with Shepard—whether it was to kill the victim or for the alternative purpose offered in Dixon's testimony (to track the victim to dig up damaging information to share with the girlfriend).[10]

## C. Analysis: Any Error Was Harmless

We conclude that the court of appeals erred in its harm analysis; even assuming the admission of the evidence was error, it was clearly harmless.  The CSLI evidence showed that Dixon was in Lubbock on March 12, 2012, but that was not the day that the victim was killed.  The victim was killed months later, on July 10.  Because this was a murder-for-hire case, the evidence did not have to show that Dixon was in Lubbock at all, much less on a particular day.  And in fact, the evidence showed that Dixon was not in Lubbock on the day of the murder.  His presence in Lubbock on some other day months before, even coupled with Shepard's presence and their conversation, was not particularly important to this prosecution.

---

[6]  *Id.* at 367 (emphasis in original).

[7]  *Id.* at 366.

[8]  *Id.* at 367.

[9]  *Id.* at 368.

[10]  *Id.* at 367-68.

Moreover, Dixon's own theory of the case was that he hired Shepard to track and photograph the victim. Dixon's presence in Lubbock to confer with Shepard would be entirely consistent with that purpose.

Further, of the fifty-five pages of cell phone records introduced by the State, only four pages were from Dixon's cell-phone provider. The other fifty-one pages were records from Shepard's cell-phone provider, the admission of which is not challenged here. Shepard's phone records provided plenty of evidence that Dixon and Shepard were working together. The March 12 CSLI information was not particularly significant in light of the evidence from Shepard's phone.

As for the State's use of the CSLI to impeach Dixon's credibility, Dixon's credibility was also impeached by the evidence that he bought gas in Plainview on March 12. The shortest route from Amarillo to Lubbock goes straight through Plainview, so this evidence suggested that Dixon was traveling between Amarillo and Lubbock on March 12.[11] The State showed that Shepard was in Lubbock on that date by means of the location information from his phone records. This properly admitted evidence, which suggested that both men were in Lubbock on the same day, was a significant basis for the jury to disbelieve Dixon's testimony that he was not with Shepard in Lubbock. The CSLI from Dixon's phone provided a more specific link between Dixon and Shepard's locations, giving the jury an incrementally greater reason to doubt Dixon's testimony

---

[11] Dixon's concession at trial that he must have traveled to Lubbock because the cell phone records showed him there also impeached his credibility. Although this concession was in response to illegally obtained evidence, the Fourth Amendment does not require the exclusion of evidence used to impeach false testimony by the defendant. *See Duckworth v. Egan*, 492 U.S. 195, 208 (1989) (citing *Walder v. United States*, 347 U.S. 62, 65 (1954) ("exclusionary rule does not create 'a shield against contradiction of [the defendant's] untruths' and evidence seized in violation of the Fourth Amendment may be used for impeachment purposes") (bracketed material in *Egan*)). There is a good argument, therefore, that the concession was not illegally obtained.

about whether he was with Shepard that day, but it was not conclusive—the location data could not rule out the possibility that the two just happened to be in the same general area.

Moreover, there was other evidence that seriously undermined Dixon's credibility. Dixon admitted at trial that he had lied in an interview with the Lubbock Police. And one of his lies was central to the prosecution: Dixon said that he knew nothing about Sonnier. In fact, though, he testified at trial that he had hired Shepard to track Sonnier. And Shepard's phone records showed that Dixon called Shepard within minutes of the end of the police interview.

In summary, Dixon's whereabouts on March 12, and any deception about those whereabouts, were not a significant pillar of the State's case. Far more important were Dixon's admitted hiring of Shepard to track the victim, the numerous phone contacts between the two, Dixon's hiding of this arrangement from the police, his later phone call to Shepard within minutes after contact with law enforcement, and Shepard's admission to his roommate that Dixon had hired him to kill the victim. The admission of the March 12 location evidence was harmless beyond a reasonable doubt.

## II. Public Trial

### A. Trial Proceedings: Exclusion of Some Persons from Courtroom

#### 1. Sketch Artist

First, during jury selection, the bailiffs excluded a sketch artist from the courtroom. The bailiffs told the sketch artist that there was no room for him. When the trial court became aware of this, it allowed the sketch artist to sit in the jury box. The next day, Dixon complained about the exclusion. One of his attorneys claimed that the sketch artist "was sitting out in the hallway the entire time yesterday." The record does not reveal when counsel became aware of the situation.

## 2. Hearing Outside Jury's Presence

Second, the trial judge asked for the courtroom to be cleared of spectators after an argument erupted between the attorneys after the jury was released for the day. Before the jury was released, defense attorney Sellers asked a witness on cross-examination, "Here in this courtroom you know that David Shepard has repeatedly said, 'Mike Dixon did not pay me for this murder.'" Prosecutor Jackson, who had questioned the witness on direct examination, interjected, "Your Honor, may I take this witness on voir dire?" The trial court responded, "The Court is going to instruct the two of you not to talk about the question that was just asked." Defense attorney Hurley then stated, "I'm going to object that that violates our rights under the 5th Amendment to the United States Constitution and 105 of the Code of Criminal Procedure." Defense attorney Sellers then asked, "You're aware that as recently as two weeks ago David Shepard told Matt Powell [one of the prosecutors]–" but was interrupted by prosecutor Stanek, who objected to hearsay. The trial court sustained the objection, and Sellers passed the witness. Prosecutor Powell then said, "Judge, now it's out there we need to go into it now. I mean, Counsel – may we approach?" At this point the trial judge released the jury for the day.

After the jury was released, the parties' attorneys began to argue with each other, as follows:

PROSECUTOR POWELL: I guess I need to do a Motion in Limine on everything when I rely on Counsel to follow Rules of Evidence. I obviously know I can't do that, because he purposefully put that – he knows that's an improper question. He knows he cannot get into that information, that it's hearsay without an exception, and he knows that. If he doesn't then he needs to go back and get a refresher course.

THE TRIAL COURT: Well, both of you –

DEFENSE ATTORNEY HURLEY: That's Brady –
DEFENSE ATTORNEY SELLERS: And you weren't going to turn it over.

The trial court then responded, "Hey, y'all chill out. Everybody—if everybody would please excuse yourself from the courtroom except for the attorneys." Defense counsel then objected that "that's a violation of *Presley v. Georgia*."[12] The trial court responded, "From now on one person asking questions will be the one that makes objections. None of this all four people making any objections. Is that understood?" Mr. Hurley, responded that he understood the court's ruling but wanted to advise the court of a constitutional violation. The trial court responded, "Well you can advise Mr. Sellers, and he can make that objection." Mr. Hurley then stated that "sometimes it's not timely" and that he was going to continue to object to constitutional violations. The parties' attorneys then began discussing other matters, but at some point, Mr. Hurley returned to his objection: "I want to say for the record that the Court has excused about 50 people from the gallery, and they are not present for this conference, this discussion we're having. We object under the 6th Amendment, the 14th Amendment and right now it's basically all lawyers and staff from the D.A.'s office in the courtroom and all of the public has been excused." Two of the prosecutors then began discussing which people present were or were not from the prosecutor's office. The trial court then interrupted, "Well, there's going to be a $500.00 fine for everybody that makes some comment other than asking questions. These side-bar comments are going to stop, or you are going to start writing checks, every one of you. Anybody have any questions about this?" Mr. Hurley, Mr. Sellers, and one of the prosecutors replied, "No, sir." When asked if there was anything else to take up outside the presence of the jury, the parties initially responded that there was not, but the defense then engaged in a discussion with the trial court about a video statement. The defense did not further address the *Presley* objection, and the trial court did not rule on it.

---

[12] *See Presley v. Georgia*, 558 U.S. 209 (2010).

### 3. Closing Arguments

Third, in a motion for new trial, Dixon complained for the first time that some members of the public were excluded from the courtroom during closing arguments.  In affidavits, the defense attorneys claimed that they learned about the exclusion after trial.

At the motion-for-new-trial hearing, the wife of one of the defense attorneys testified that, when she arrived fifteen minutes after the proceedings had started that day, two sheriff's deputies "were preventing anyone to come in."  She stated that four or five people, including herself, were excluded.  She further testified that, when asked, "Why can't we come in?" one of the deputies responded, "He doesn't want anyone standing."  She then stated that she "looked in and there were empty spots."  When asked, on cross-examination, whether she told her husband or the other defense attorney during one of the breaks in argument about what was going on, she responded that she did not.  When asked if she was ultimately able to enter the courtroom, she responded that she was able to enter when someone she knew was coming out.    The defense called another attorney, who was not affiliated with the case.  This attorney testified that she wanted to watch closing arguments but was told that she could not go into the courtroom because the judge did not want anyone standing.  She responded affirmatively when asked if the judge said "it would be one in, one out."  The sergeant who supervised security at the courthouse testified that the judge allowed only for those who could sit and that the policy would be that one could come in when another person went out.  The sergeant testified that the courtroom appeared to be full but that he could not say whether there were any empty seats.  The sergeant also testified that the courtroom used for trial was the largest courtroom in the courthouse.

In its findings of fact, the trial court found that the trial was held in the largest courtroom in

the courthouse and that "the courtroom was filled to capacity with spectators" during closing arguments.  The trial court further found that "[a]ny regulation of entrants into the courtroom was done for safety reasons, to maintain courtroom decorum, and to minimize juror distraction."

## B. Appeal

Dixon complained that these three instances—when the bailiffs excluded a sketch artist during jury selection, when the trial court ordered spectators out of the courtroom after releasing the jury for the day, and when some persons were excluded during closing arguments—constituted the improper closing of the courtroom.  The court of appeals agreed.[13]  In response to the State's arguments that Dixon failed to preserve error with respect to the first and third instances of courtroom closure, the court of appeals pointed to Dixon's objection to the exclusion of the sketch artist, to Dixon's claim in his motion for new trial regarding the exclusion of spectators during closing argument, and to Dixon's claim that he learned of the closing-argument exclusion after trial.[14]  The court of appeals further stated: "The State does not point us to, and we do not find, facts in the record tending to indicate that appellant's complaints of the first and third closures were not made at the earliest possible opportunity."[15]

## C. Analysis

The right to a public trial is forfeitable and must be preserved by a proper objection at trial.[16]

---

[13]  *Dixon*, 566 S.W.3d at 371, 373-74.

[14]  *Id.* at 371 n.27.

[15]  *Id.*

[16]  *Peyronel v. State*, 465 S.W.3d 650 (Tex. Crim. App. 2015).

Preservation requires a timely, specific objection.[17] The complaining party must also obtain a ruling on the objection, or absent a ruling, the complaining party must object to the trial court's refusal to rule.[18] As the appealing party, Dixon had the burden to bring forth a record showing that error was preserved.[19] The State has argued preservation on only the first and third instances for which Dixon alleges an improper closure, but preservation of error is a systemic requirement that a first-tier appellate court is obligated to address before reversing a conviction.[20] When the court of appeals has failed to address an outstanding issue of error preservation, this Court can do so when confronted with one.[21] We conclude that Dixon has failed to meet his burden to show preservation as to the second instance as well as the first instance.

### 1. The Sketch Artist

With respect to the first instance, the exclusion of the sketch artist, Dixon's objection was late. Dixon did not object to the exclusion of the sketch artist until the next day. When he objected, he said that the sketch artist was in the hallway the day before, but he did not explain when the defense became aware of that fact. The court of appeals concluded that the State did not point to facts in the record showing that the objection was not made at the earliest opportunity, but that places

---

[17] TEX. R. APP. P. 33.1(a)(1)(A).

[18] *Id.* 33.1(a)(2).

[19] *See Word v. State*, 206 S.W.3d 646, 651-52 (Tex. Crim. App. 2006) ("It is usually the appealing party's burden to present a record showing properly preserved, reversible error.").

[20] *Darcy v. State*, 488 S.W.3d 325, 327-28 (Tex. Crim. App. 2016).

[21] *Id.* We note that Dixon's brief before us contends that error was preserved with respect to the second instance: "Both defense counsel immediately objected and made a record that no member of the public remained in the courtroom. Accordingly, this error was preserved." (Citation omitted).

the burden of proof on the wrong party. It was Dixon's burden to prove that his objection was made at the earliest opportunity. The record shows that the objection was made late, so Dixon was required to proffer information justifying a late objection. He has not done so because his attorneys did not explain when the sketch artist's exclusion first came to their attention.

### 2. Hearing Outside the Jury's Presence

In the second instance, when the trial court ordered the courtroom cleared, the defense objected at the time of the event but never obtained a ruling. The trial court told the attorneys that the "person asking the questions will be the one that makes any objections." Instead of following that procedure, a defense attorney who was not asking questions continued with the objection, the discussion shifted to other matters, and the trial court did not rule on the objection. We need not decide whether the defense team procedurally defaulted error by failing to follow the trial court's procedure regarding which attorney must make the objection because none of the defense team requested a ruling from the trial court or objected to the trial court's refusal to rule.[22] Although the trial court threatened to fine the attorneys, it was specifically for making sidebar comments. The court did not threaten to fine the attorneys for making objections or for asking for a ruling on an

---

[22] *Cf. Cameron v. State*, 490 S.W.3d 57, 61 (Tex. Crim. App. 2014) ("As we view it, the record shows very clearly that the appellant's trial counsel brought the issue of the closed courtroom to the attention of the trial court. The court acknowledged the appellant's Sixth Amendment rights and then stated that the courtroom was not closed. Counsel then requested (at least six separate times) that the court rule on his objection, but the court declined to rule. Texas Rule of Appellate Procedure 33.1 clearly states that, in order to preserve error, the record must show that the trial court either 'ruled on the request, objection, or motion either expressly or implicitly or refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.' This happened below."); *see also Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016) (plurality op.) ("Appellant never asked for a ruling on the issue, nor did he object to the trial judge's failure to rule. Because he failed to obtain a ruling on the Fourth Amendment complaint, he failed to preserve error with respect to that complaint.").

objection.  At any rate, when asked if they had anything further to take up outside the presence of the jury, the defense attorneys could have, but did not, ask for a ruling on the public-trial objection.

### 3. Closing Arguments

Regarding the third instance, under *Presley*, "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."[23]  The trial court found that the courtroom was filled to capacity.   Although there was testimony from a defense attorney's wife that there were empty seats in the courtroom, the trial court was not required to believe this testimony and could rely upon its own recollection that the courtroom was full.[24]  The exclusion of spectators from the courtroom because the courtroom is full is not by itself a violation of the right to a public trial.[25]

---

[23]  *Presley*, 558 U.S. at 215.

[24]  *See Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2013) ("The trial court, as factfinder, is the sole judge of witness credibility at a hearing on a motion for new trial with respect to both live testimony and affidavits.  Accordingly, the appellate court must afford almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor.  This same deferential review must be given to a trial court's determination of historical facts based solely on affidavits, regardless of whether the affidavits are controverted.  Here, in viewing the evidence in a light most favorable to the trial court's ruling, the court of appeals should have deferred to the trial court's implied finding that counsel's affidavit lacked credibility.  In the absence of that affidavit, the court of appeals should have examined the totality of the record in a light most favorable to the trial court's ruling.") (citations omitted).

[25]  *See United States v. Downs-Moses*, 329 F.3d 253 (1ˢᵗ Cir. 2003) (quoting *United States v. Kobli*, 172 F.2d 919, 923 (3d Cir. 1949) ("The courts . . . have denied that the constitutional right to a public trial involves the necessity of holding the trial in a place large enough to accommodate all those who desire to attend.") (ellipsis in *Dawns-Moses*)); *St. Clair v. Commonwealth*, 140 S.W.3d 510, 555 (Ky. 2004) ("[T]he exclusion of a single member (or even a handful of members) of the public from trial proceedings will not convert an otherwise public trial into a 'star chamber.'") (also quoting *Wendling v. Commonwealth*, 143 Ky. 587, 137 S.W. 205, 211 (1911) ("The provision in section 11 of the Constitution recognizing the right of an accused to have a public trial does not mean that all of the public who desire to be present shall have opportunity to do so . . . The

In a notorious case from Texas involving cameras in the courtroom, the Supreme Court explained that the purpose of the Sixth Amendment right to a public trial is to guarantee that the accused will be fairly dealt with and not unjustly condemned.[26] History, the Court said, "had proven that secret tribunals were effective instruments of oppression."[27] It is the danger of secret trials, then, that the right to a public trial was meant to address.[28]

Chief Justice Warren explained that a trial is public, in the constitutional sense, "when a courtroom has facilities for a reasonable number of the public to observe the proceedings."[29] And in a concurring opinion in that same case, Justice Harlan explained:

> Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the "public" will be present in the form of those persons who did gain admission. Even the actual presence of the public is not guaranteed. A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and

---

requirement is fairly observed if . . . a reasonable proportion of the public is suffered to attend.") (internal quotation marks omitted, ellipses in *St. Clair*)); *Williams v. Nelson*, 172 Colo. 176, 178, 471 P.2d 600, 601-02 (1970) ("Being filled to capacity, it was undoubtedly true that some persons were thus prevented from attending the hearing. But this did not transform it into a secret hearing. It remained in every sense a public hearing. The requirement of a public trial is fairly observed if without partiality or favoritism a reasonable portion of the public is suffered to attend."); *State v. Saale*, 308 Mo. 573, 580-81, 274 S.W. 393, (1925) ("[T]he right of a defendant in a criminal case to a public trial is not violated, where, after admitting the public until the seats of the court room were filled, others seeking admission are excluded.") (citing *State v. Brooks*, 92 Mo. 542, 5 S.W. 257 (1887), *overruled on other grounds by State v. Hathorn*, 166 Mo. 229, 65 S.W. 756 (1901)).

[26]  *Estes v. Texas*, 381 U.S. 532, 538-39 (1965).

[27]  *Id*. at 539.

[28]  *Id*.

[29]  *Id.* at 584 (Warren, C.J. concurring).

observe the trial process.[30]

Just so. Here, the trial court reasonably accommodated public attendance by using the largest courtroom in the courthouse. There was no error.

### III. Disposition

As the court of appeals observed, Dixon raised fifty issues before it, and the court of appeals addressed only some of those issues.[31] We reverse the judgment of the court of appeals and remand the case to that court to address Dixon's remaining claims that have not yet been addressed.

Filed: January 15, 2020
Publish

---

[30] *Id.* at 588-89 (Harlan, J., concurring).

[31] *Dixon*, 566 S.W.3d at 354. In addition to the CSLI and public-trial claims, the court of appeals also addressed—and rejected—sufficiency-of-the-evidence claims. *See id.* at 354-63.