

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-16-00058-CR

THOMAS DIXON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2012-435,942, Honorable Jim Bob Darnell, Presiding

December 13, 2018

OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

Appellant Thomas Dixon, an Amarillo plastic surgeon, was indicted on two counts of capital murder for the July 10, 2012 death of Lubbock physician, Joseph Sonnier, M.D. The State did not seek the death penalty. After the first trial ended in a mistrial, the case was retried, and a second jury found appellant guilty of both counts of capital murder. The trial court signed a separate judgment for each count, imposing in each judgment the

mandatory sentence of life in prison without the possibility of parole.[1] On appeal, appellant raises fifty issues challenging his convictions. For the reasons we will describe, we will reverse the trial court's judgments and remand the case for a new trial.

Analysis

To resolve the appeal, we find it necessary to address three groups of the issues appellant raises. We will begin with his first and second issues, by which appellant challenges the sufficiency of the evidence supporting his convictions. We then will discuss his issues numbered 43 through 47, concerning the trial court's ruling on his motion to suppress historical cell site data obtained from his cell phone service provider without a warrant. Finally, we will address appellant's issues numbered 11 through 16, regarding occasions on which members of the public were excluded from the courtroom during appellant's trial. We will give relevant background facts in our discussion of each of the issue groups.

**Sufficiency of the Evidence – Issues One and Two**

By the indictment and its evidence, the State alleged appellant was guilty of capital murder under two provisions of the Texas Penal Code. The indictment's first count alleged appellant intentionally or knowingly caused Sonnier's death by employing David Shepard to murder Sonnier for remuneration or the promise of remuneration, and Shepard caused Sonnier's death by shooting and stabbing him.[2] Appellant's guilt under

---

[1] *See* TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2018) (punishments for capital felony).

[2] *See* TEX. PENAL CODE ANN. § 19.03(a)(3) (West Supp. 2018) (murder for remuneration).

the second count required proof he was criminally responsible for Shepard's conduct.[3] In that way, the second count alleged, appellant was guilty of intentionally causing Sonnier's death by shooting and stabbing him, in the course of committing or attempting to commit burglary of Sonnier's residence.[4] As noted, the jury found appellant guilty on both counts.[5]

On appeal, he contends the evidence presented to the jury was not sufficient to support a conviction under either count. We begin with these issues because sustaining them would entitle appellant to the greatest relief, a judgment of acquittal. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Sonnier was found dead in the garage of his Lubbock home on the morning of July 11, 2012. He had been stabbed and shot. That appellant's friend David Shepard entered Sonnier's home through a window and killed Sonnier was not disputed at appellant's trial and is not questioned on appeal. Shepard pled nolo contendere to the capital murder of Sonnier. Under the terms of a plea-bargain agreement, he was sentenced to confinement in prison for life without the possibility of parole.

There was no evidence appellant was present at the time of Sonnier's murder. In fact, undisputed alibi evidence established appellant was in Amarillo at the time.

---

[3] *See* TEX. PENAL CODE ANN. § 7.01 (parties to offenses); § 7.02 (West 2011) (criminal responsibility for conduct of another).

[4] *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2018) (murder in the course of burglary).

[5] By other issues raised in his brief, appellant contends his two convictions for the murder of one victim violate the prohibition on double jeopardy. Given our disposition of the issues we discuss, we need not address the double-jeopardy claim.

3

Early in his investigation of the murder, Lubbock police detective Zach Johnson interviewed Sonnier's girlfriend, Richelle Shetina. She and Sonnier recently had returned from celebrating her birthday in France. Shetina previously had been involved in a relationship with appellant. She gave Johnson a list of those she felt law enforcement should contact. The list included appellant.

During the late evening of July 11, Johnson and Lubbock police detective Ylanda Pena interviewed appellant and his new girlfriend, Ashley Woolbert, at appellant's Amarillo home. Appellant told Johnson he knew nothing about Sonnier. But regarding Shetina, he told Johnson he "would love to have her back," and it "broke his heart" she was in another relationship.

While Johnson spoke with appellant, Pena interviewed Woolbert. She told Pena of another person, "Dave." According to Woolbert's testimony she, appellant, and Shepard had dinner together on July 11. As the detectives were leaving appellant's residence Pena asked appellant about "Dave." He explained Dave was his friend, Dave Shepard. He gave the detectives Shepard's telephone number.

Appellant also told the detectives Shepard came by his house between 10:00 and 10:30 the evening before "to get two cigars."[6] Telephone records in evidence indicate that, within minutes of the detectives' departure, appellant called Shepard and they regularly communicated during the following hours. Immediately after appellant's call, Shepard telephoned his roommate, Paul Reynolds.

---

[6] Testimony showed appellant and Shepard enjoyed good cigars, and that appellant recently had returned from a trip to Bermuda with friends and had brought some Cuban cigars home. It was two of the Cuban cigars that appellant gave Shepard.

Twice during the three or four days following Sonnier's murder, Shepard attempted suicide. On the evening of July 14, appellant met Shepard at appellant's medical office where he stitched Shepard's left wrist, following the second failed suicide attempt.

On Sunday, July 15, Reynolds contacted the Lubbock crime line and related that Shepard confessed to him that appellant paid Shepard to kill Sonnier. Police obtained warrants and Shepard and appellant were arrested on July 16. Indictments followed.

Shepard led police to an Amarillo lake where he said he threw the pistol he used to shoot Sonnier. Police divers recovered the pistol from the lake. A Department of Public Safety firearms examiner testified that the cartridge casings recovered from Sonnier's residence had been "cycled through" the recovered pistol. The pistol was one that appellant's brother had given appellant.

For appellant's second trial, Shepard was brought from prison on a bench warrant and held in the county jail throughout trial. But neither the State nor the defense presented him as a witness. This meant the State's direct proof of an agreement between appellant and Shepard for the murder of Sonnier depended on hearsay statements attributed to Shepard.

Reynolds testified for the State. He related a conversation he and Shepard had on July 12. According to Reynolds, Shepard told him that he had killed a man by shooting him. He said he and appellant planned the murder, and appellant gave him the gun he used. Reynolds said Shepard told him Sonnier "had been causing problems" for appellant and "there was a girlfriend that they had in common." Reynolds further testified that Shepard told him Dixon paid Shepard three bars of silver to kill Sonnier. Evidence

5

showed Shepard sold a silver bar at an Amarillo pawn shop on June 15, 2012, and sold two silver bars to the same business on July 11, the day following Sonnier's murder.

Johnson testified that Reynolds told him that appellant's involvement "in the murder for hire plot was that he had paid David Shepard in three silver bars to commit the murder of Dr. Sonnier." Johnson further testified that Shepard told him "all about how he and Dixon had for months surveilled and planned and funded and had carried out this execution of Dr. Sonnier."

Appellant testified in his defense and denied any involvement in Sonnier's murder. Appellant related to the jury that he and his wife divorced after he began an affair with Shetina. While the divorce was pending appellant purchased shares in an allergy testing business Shepard was starting, Physicians' Ancillary Services, Inc. (PASI). Because of his ongoing divorce proceeding, appellant said, he purchased his interest in PASI with three silver bars that were his separate property.

After he divorced his wife for Shetina,[7] appellant's relationship with her became difficult. According to appellant's testimony, she was demanding and volatile, and pushed him to give her an engagement ring. Nonetheless, his ego was deeply wounded, he said, when Shetina told him in January 2012 she could not meet him to discuss their relationship because she had begun a "committed" relationship with Sonnier. She lauded Sonnier in social media posts.

---

[7] He once told Shetina in a text message that she was the "sole reason" for his divorce. In another message, he said he "sold [his] family down the river for her."

6

Appellant's testimony indicated that meanwhile he and Shepard were "meeting regularly" to discuss Shepard's efforts to initiate PASI's allergy-testing business. The business required referrals from physicians and Shepard represented to appellant that he was regularly traveling to Lubbock to solicit physicians. At a point, appellant testified, Shepard said some people he met in Lubbock told him Sonnier was seeing other women. Appellant further testified Shepard led him to believe he had been a private investigator, and that he could obtain proof that Sonnier was dating women other than Shetina. Over a period of some four months leading up to the day of Sonnier's murder, appellant said, he encouraged Shepard in plans to discredit Sonnier in Shetina's eyes. By one plan, sometimes referred to in the record as "Plan A," Shepard would obtain photographs of Sonnier with other women, for appellant to show Shetina.[8] By another, "Plan B," Shepard would hire a female to tell Shetina that Sonnier was unfaithful.

Evidence showed during this time appellant and Shepard communicated regularly, by cellphone and text message. The following exchange of text messages between Shepard and appellant occurred on July 9, 2012, the day before Sonnier's murder.

| Shepard to Appellant: | Appellant to Shepard: |
|---|---|
| "Perfect day for travel to hub city." 4:23 p.m. | "Need it done ASAP" 4:24 p.m. |
| "Me too." 4:25 p.m. | |
| "I've got gas and ready to head south tomorrow." 8:26 p.m. | "Yay" 8:27 p.m. |
| "Got a good feeling about tomorrow." 8:28 p.m. | "Hope so :-)" 8:32 p.m. |
| "Hope he shows." 8:51 p.m. | |

---

[8] Appellant testified his "understanding of Plan A initially was that [Shepard] was going to take some pictures, and then it sort of morphed into he was going to place a camera that could do that remotely for him."

7

On July 10, the day of Sonnier's murder, Shepard and appellant exchanged some forty-one telephone and text messages. The text messages of that day in evidence were as follows:

| Shepard to Appellant: | Appellant to Shepard: |
|---|---|
| | "Absolut."  12:48 p.m. |
| | "Put it on em."  12:48 p.m. |
| "On target"  4:53 p.m. | |
| "Still no show, only been an hr, but Damn."  5:56 p.m. | "Patience"  5:56 p.m. |
| "Easier said then (sic) done with your c - - - hanging out.  Persevere we shall" 6:02 p.m. | |
| "At least I'm not sweating my a - - off"  6:03 p.m. | |
| "Vitamins supplements I bought must be helping as well."  6:06 p.m. | "Good"  6:07 p.m. |
| "Any Intel from anywhere?"  6:46 p.m. | "No"  6:46 p.m. |
| "Almost 2 hrs."  6:46 p.m. | "Hold fast"  6:47 p.m. "Patience"  6:47 p.m. |
| "How long do you think it is safe to park my car on the street, unattended?"  7:38 p.m. | |
| "Been parked since 4:45" 7:39 p.m. | "Been"  7:39 p.m. |
| | "I think it's ok"  7:40 p.m. |
| "Almost have to stay another 30-45 min. to allow dusk to cover exit now.  Hearing activity in alley.  7:42 p.m. | "K"  7:43 p.m. |
| "Will keep you posted."  7:44 p.m. | |

Appellant testified he thought on the day of the murder Shepard was at Sonnier's house to place a camera to take the pictures they sought. After the police visited appellant on July 11, he deleted a number of text messages from his cellphone and jumped into his

swimming pool with his cellphone in an attempt to destroy stored text messages. Because appellant had backed up the messages on his cellphone to his laptop computer, however, many were recovered. A substantial volume of communication evidence recovered from the cellphones of Dixon, Shepard, and Reynolds was presented at trial.

*Consideration of Objected-to Hearsay Statements in Sufficiency Review*

Case law establishes that an appellate court reviewing the sufficiency of the evidence to support a conviction considers all the evidence in the record, whether direct or circumstantial, and whether properly or improperly admitted. *See Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

At the outset of our discussion of the sufficiency of the evidence supporting his convictions, we must address appellant's contention regarding the proper treatment of hearsay statements offered by the State and admitted over his objection. On appeal, appellant raises issues challenging the trial court's admission of the hearsay statements. And, he argues, as we review the sufficiency of the evidence supporting the essential elements of the charged offenses, we consider inadmissible hearsay statements that were admitted over objection but we must regard such statements as lacking any probative value and thus as incapable of supporting a judgment.[9]

---

[9] Appellant builds his argument chiefly on *Gardner v. State,* 699 S.W.2d 831, 835 (Tex. Crim. App. 1985) (op. on reh'g) (stating "inadmissible hearsay is the only form of evidence that lacks probative value. Since such evidence lacks probative value, it is discounted when determining sufficiency questions").

9

We disagree with appellant's position. Regarding the interplay between objected-to hearsay statements and sufficiency review, we consider the following discussion from *Moff v. State,* 131 S.W.3d 485 (Tex. Crim. App. 2004), to be dispositive of the matter:

> Sometimes a claim of trial court evidentiary error and a claim of insufficient evidence overlap so much that it is hard to separate them. For example, suppose that the identity of a bank robber is proven through the testimony of one and only one witness at trial. Suppose further that this witness' testimony is rank hearsay: "Little Nell told me that Simon was the bank robber." On appeal a defendant might raise a hearsay claim and a claim of sufficiency of the evidence to prove identity. He will have the right to have the hearsay question considered on its merits only if he objected properly at trial; he will have the right to have the question of the sufficiency of evidence to prove identity considered on its merits whether or not he objected.
>
> But an appellate court must consider *all* evidence actually admitted at trial in its sufficiency review and give it whatever weight and probative value it could rationally convey to a jury. Thus, even if the trial court erred in admitting the witness' testimony of Little Nell's out-of-court statement, the reviewing court must consider that improperly-admitted hearsay in assessing the sufficiency of the evidence to prove the bank robber's identity. As Professors Dix and Dawson explain: "an appellant . . . is not entitled to have an appellate court first consider the appellant's complaints concerning improper admitted evidence and, if it resolves any of those in favor of the appellant, to then, second, consider the sufficiency of the properly-admitted evidence to support the conviction."[10]

---

[10] *Moff* continues:

There is much logic in that rule:

> This rule rests in large part upon what is perceived as the unfairness of barring further prosecution where the State has not had a fair opportunity to prove guilt. A trial judge's commission of trial error may lull the State into a false sense of security that may cause it to limit its presentation of evidence. Erroneous admission of hearsay evidence, for example, may cause the State to forego offering other evidence that would ultimately prove admissible.

*Id.* at 489-90 (footnotes omitted, emphasis in original) (citing George E. Dix and Robert O. Dawson, 43A TEXAS PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 43.531, at 742 (2d ed. 2001)). Other more recent opinions of the Court of Criminal Appeals are in accord with *Moff. See, e.g., Winfrey v. State,* 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); *see also Griffin v. State,* 491 S.W.3d 771, 781 n.3 (Tex. Crim. App. 2016) (Yeary, J., dissenting) (noting "[u]nobjected-to hearsay has probative value" and "even had the [witness's] testimony been erroneously admitted over an objection, the Court would still take it into account in [its] sufficiency analysis") (citing *Winfrey,* 393 S.W.3d at 767); *Thomas v. State,* 753 S.W.2d 688, 695 (Tex. Crim. App. 1988) (stating jurors do not act irrationally taking into account evidence that was erroneously admitted). For that reason, regardless whether the court properly admitted Reynolds' and Johnson's testimony to Shepard's hearsay statements, we consider the testimony for the purpose of evaluating the sufficiency of the evidence to support the jury's verdicts.

*Sufficiency of the Evidence*

To assess the sufficiency of the evidence supporting a conviction, we review all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a

---

In our example, had the judge excluded the hearsay identification evidence, the State might have put on other evidence to prove identity. The remedy lies in a new trial, not an acquittal for insufficient evidence, because "the risk of frustrating the State's legitimate interest in a full opportunity to prove guilt, in any case, outweighs the defendant's interest in being subjected to trial only once."

*Moff*, 131 S.W.3d at 490 (footnotes omitted) (quoting in part 43A Dix and Dawson § 43.531, at 742).

reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a fact finder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." *Brooks*, 323 S.W.3d at 917. When reviewing all of the evidence under the *Jackson* standard of review, we consider whether the jury's finding of guilt was a rational finding. *Id.* at 907. We must "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* at 899-900. As the Supreme Court put it in *Jackson*, the standard of review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

With respect to count one of the indictment,[11] the jury heard appellant acknowledge he gave three bars of silver to Shepard. The jury heard two versions of the purpose for their transfer. Appellant testified the bars constituted his investment in PASI. Reynolds

---

[11] As to count one, the jury was instructed as follows by the jury charge's application paragraph:

> Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about July 10, 2012, in Lubbock County, Texas, THOMAS DIXON, did then and there, intentionally or knowingly cause the death of an individual, namely Joseph Sonnier, III, by employing David Shepard to murder the said Joseph Sonnier, III for remuneration or the promise of remuneration, from the Defendant, and pursuant to said agreement, the said David Shepard did then and there intentionally or knowingly cause the death of the said Joseph Sonnier, III by shooting the said Joseph Sonnier, III and by stabbing the said Joseph Sonnier, III, then you will find the defendant guilty of capital murder as charged in the indictment.

testified that Shepard told him appellant paid him the silver to murder Sonnier. Johnson testified Shepard told him essentially the same thing. Under the standard of review we apply, it was the role of the jury to resolve the conflict in the testimony and determine whether appellant's statement, or Shepard's incriminating statements related by Reynolds and Johnson, truthfully reflected the purpose for appellant's transfer of the silver to Shepard.[12] Appellant's text messages urging Shepard to persevere in carrying out their plan also are pertinent here. In sum, the evidence permitted the jury rationally to conclude, beyond a reasonable doubt, that appellant was guilty of capital murder for remuneration as alleged by count one of the indictment.

Under count two of the indictment, appellant's guilt required proof Shepard intentionally caused Sonnier's death in the course of committing or attempting to commit burglary of his habitation, and that appellant, acting with intent to promote or assist the commission of the offense, encouraged, directed, aided, or attempted to aid Shepard to commit the offense.[13]

A large body of evidence showed Shepard entered Sonnier's home by pushing in a rear window. It is undisputed that inside the home Shepard murdered Sonnier. In addition to the evidence we have noted indicating that appellant paid Shepard the silver for the murder, the State placed in evidence many text messages, some quoted above,

---

[12] The State contends appellant's promise to give Shepard the Cuban cigars also could have been the remuneration for the murder. We need not address that contention here.

[13] The jury was instructed: "Our law provides that a person commits the offense of burglary of a habitation, if, without the effective consent of the owner, he enters a habitation with intent to commit a felony, theft or assault." *See* TEX. PENAL CODE ANN. § 30.02(a)(1) (West Supp. 2018) (burglary).

and evidence of telephone calls showing a stream of communication between Shepard and appellant over the months preceding the murder. As we will discuss in detail later in the opinion, expert testimony based on cell tower location information placed both Shepard and appellant in Lubbock on March 12, 2012, near locations associated with Sonnier and Shetina, further suggesting appellant's encouragement and direction of Shepard's activities leading up to the murder.

From the texts we have quoted that the two exchanged on July 9 and 10, the jury reasonably could have determined that the two anticipated Shepard would accomplish some task at a Lubbock location, and that Shepard was on location from near 5:00 p.m. on July 10, awaiting an individual to "show." The jury reasonably could have read appellant's texts to encourage Shepard's completion of the anticipated task, and to encourage him to be patient and "hold fast." It appears also from Shepard's texts that he feared being discovered at his location. Because there is no dispute that Shepard, during that evening, entered Sonnier's home and killed him, we agree with the State the jury rationally could infer that it was Shepard's murderous activity that the two anticipated, and that appellant was encouraging and directing through his text messages. Further, it is undisputed that the pistol found in the lake, through which the cartridge casings found at the murder scene had been "cycled," belonged to appellant.

From our review of the entirety of the evidence before the jury, viewed in the light most favorable to its verdict, we find the jury acted rationally by concluding beyond a reasonable doubt that appellant was guilty of capital murder as described in count two.

14

*Accomplice Witness Testimony*

We will address also appellant's argument that the testimony of accomplice witnesses was not corroborated as required by law.

An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state. *Nelson v. State,* 297 S.W.3d 424, 429 (Tex. App.—Amarillo 2009, pet. ref'd) (citing *Druery v. State,* 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)). The testimony of an accomplice is considered untrustworthy and should be "received and viewed and acted on with caution." *Walker v. State,* 615 S.W.2d 728, 731 (Tex. Crim. App. 1981). Accordingly, before a conviction can be based on an accomplice's testimony, the testimony must be corroborated by other evidence tending to connect the accused with the crime. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Nelson,* 297 S.W.3d at 429.

The testimony of one accomplice may not be relied on to corroborate the testimony of another accomplice. *See Smith v. State,* 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (accomplice testimony must be corroborated by "other, non-accomplice evidence that tends to connect the accused to the offense").

A challenge of the sufficiency of evidence corroborating accomplice testimony is not the same as a challenge to the sufficiency of the evidence supporting the verdict. *Cantelon v. State,* 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.) (citing *Cathey v. State,* 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999)). When reviewing the sufficiency of non-accomplice evidence under Texas Code of Criminal Procedure article 38.14, an appellate court decides whether the inculpatory evidence tends to connect the

15

accused to the commission of the offense. *Smith,* 332 S.W.3d at 439. The non-accomplice evidence need not directly link the defendant to the crime, "nor does it alone have to establish his guilt beyond a reasonable doubt." *Castillo v. State,* 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). A reviewing court eliminates all the accomplice testimony from its consideration and examines the remaining portions of the record to determine whether any evidence tends to connect the accused with the commission of the offense. *Castillo v. State,* 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). It views the corroborating evidence in the light most favorable to the jury's verdict. *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

The defendant's liability as a principal or under a party theory is not relevant under an article 38.14 analysis. *Joubert v. State,* 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). The question is whether some evidence "tends to connect" him to the crime; the connection need not establish the exact nature of his involvement as a principal or party. *Id.*

Appellant contends Reynolds should be considered an accomplice witness; the State disagrees. We need not resolve their disagreement on that point. Although Shepard did not testify, to evaluate the non-accomplice witness evidence, we will exclude hearsay statements attributed to him. Our analysis thus considers the evidence presented to the jury through sources other than Shepard and Reynolds. *See Castillo,* 221 S.W.3d at 691.

The non-accomplice witness evidence begins with the undisputed evidence appellant's friend Shepard killed Sonnier. It continues with appellant's own testimony, from which the jury learned that Sonnier was dating Shetina, for whom appellant still had

16

strong feelings; that appellant and Shepard were engaged in an effort to photograph Sonnier with other women; that appellant understood Shepard's efforts toward that end would include planting a camera at Sonnier's house; that appellant knew Shepard was at Sonnier's house when they exchanged text messages during the late afternoon and early evening of July 10; that, when Shepard returned to Amarillo the evening of July 10, he went to appellant's house and received cigars appellant had promised him; that appellant did not mention his connection with Shepard during his initial conversation with Johnson because he feared he would be connected with the camera he believed Shepard left at Sonnier's house; and that, after learning of Sonnier's death, appellant took steps to clear text messages from his phone. Appellant also acknowledged in his testimony he had "some responsibility" for Shepard's presence at Sonnier's residence.

Other non-accomplice testimony came from Woolbert, and from two other Amarillo women who testified Shepard sought their help to discredit Sonnier in Shetina's eyes. Those three witnesses' testimony demonstrated appellant's strong interest in Shetina and in Sonnier's relationship with her. Text messages and phone records showed frequent communication between Shepard and appellant, at times leading up to and including the time Shepard was outside Sonnier's house before the murder. The non-accomplice testimony based on cell tower location information placing Shepard and appellant in Lubbock on March 12, 2012, in the vicinity of Shetina's house, Sonnier's house, and the D'Venue dance studio[14] further connects appellant with Shepard's tracking of Sonnier's

---

[14] Sonnier and Shetina frequented the dance studio and Sonnier also danced with other women who were there. Witnesses indicated a person fitting Shepard's description sat in a parked car outside the studio and once came inside.

activities. And non-accomplice testimony showed that after police departed appellant's home on the night of July 11, appellant immediately began a text message and cell phone dialogue with Shepard. An expert testified shell casings recovered from Sonnier's home had been "cycled through" the pistol appellant agreed was his.[15]

Viewed in the light most favorable to the verdict, the evidence before the jury from sources other than Reynolds and Shepard tends to connect appellant with Shepard's murder of Sonnier, satisfying the corroboration requirement. *See Joubert,* 235 S.W.3d at 731.

We overrule appellant's first and second issues.

**Failure to Suppress Historical Cell Site Location Information Obtained Without a Warrant – Issues 43 through 47**

Through his issues 43-47, appellant contends the trial court reversibly erred by failing to suppress historical cell site location information ("CSLI") derived from his cell phone, which the State obtained without a warrant from his cell service provider, AT&T.

On August 11, 2015, the State obtained a court order under the Stored Communications Act, 18 U.S.C. § 2703 and its Texas counterpart, Code of Criminal

---

[15] We do not depend on it for our conclusion there is ample evidence tending to connect appellant with Sonnier's murder, but we note that during cross examination of Reynolds, appellant placed in evidence a transcription of the recorded statement Reynolds gave Johnson and Pena. The transcription contains other statements the jury could have seen as tending to connect appellant with the murder. Because the transcription of Reynolds' statement was appellant's evidence, introduced without limitation, the law might permit its use as corroborating evidence. *Brown v. State,* 476 S.W.2d 699, 702 (Tex. Crim. App. 1972); *but cf. Smith v. State,* 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) ("an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person")). *See* 43A George E. Dix & John M. Schmolesky, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 51:68 n.2 (3d ed. 2011) (distinguishing *Brown* from *Smith*).

Procedure article 18.21, which directed appellant's cellular telephone service provider to produce "the cell tower sites and locations and call detail records belonging to [appellant's cell phone number], for the period of February 1, 2012- July 15, 2012." The order was based on "reasonable and articulable facts" which the issuing magistrate found produced a "reasonable belief" that the information sought was "relevant to a legitimate law enforcement inquiry." TEX. CODE CRIM. PROC. ANN. art. 18.21, § 5(a) (West Supp. 2018). AT&T complied with the order. Appellant filed a pretrial motion to suppress the CSLI, arguing the failure to obtain a search warrant violated the Fourth Amendment to the United States Constitution, Article I, section 9 of the Texas Constitution, 18 U.S.C. 2703, and Texas Code of Criminal Procedure article 38.23. The trial court overruled the motion.

The facts of the search and seizure of appellant's CSLI are not disputed because the information was obtained by court order. The question presented is therefore purely one of law which, in the context of reviewing a trial court's ruling on a motion to suppress, we review de novo. *Love v. State,* 543 S.W.3d 835, 840 (Tex. Crim. App. 2016) (citing *Wilson v. State,* 311 S.W.3d 452, 458 (Tex. Crim. App. 2010)).

After briefing in this appeal was completed, the United States Supreme Court decided *Carpenter v. United States,* 585 U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), in which it held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI" and, under the Fourth Amendment, law enforcement officers therefore must generally obtain a warrant before obtaining CSLI records. 138 S. Ct. at 2217, 2221. We requested the parties to supplement their appellate briefs to discuss the impact of *Carpenter* on the appeal. Both have done so.

19

As for whether the trial court erred by failing to suppress appellant's CSLI obtained by a court order but without a warrant, we believe the holding of the Court's *Carpenter* opinion is controlling and applies retroactively, a conclusion the parties do not dispute in their supplemental briefing. *See Davis v. United States,* 564 U.S. 229, 243, 244, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (citing *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987)) (newly announced rules of constitutional criminal procedure must apply retroactively without exception to all cases, state or federal, pending on direct review or not yet final); *McClintock v. State,* 541 S.W.3d 63, 67 n.4 (Tex. Crim. App. 2017) ("we ordinarily follow federal rules of retroactivity"); *cf. Olivas v. State,* No. PD-0561-17, 2018 Tex. Crim. App. Unpub. LEXIS 619 (Tex. Crim. App. Sep. 12, 2018) (per curiam) (not designated for publication) (granting petition as to defendant's challenge of CSLI obtained without a warrant and remanding case to court of appeals for further action in light of *Carpenter*, decided during pendency of petition for discretionary review). We agree with the parties that, under the holding of *Carpenter*, the trial court erred by denying appellant's motion to suppress his CSLI.[16] That evidence should not have been presented to the jury. We next must consider the harmfulness of the error.

When, as here, the trial court's error is constitutional, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the

---

[16] For the same reason the court discussed in *Love,* 543 S.W.3d at 845, we need not consider whether the State may have obtained appellant's CSLI in objective good faith reliance on the lawfulness of the court order obtained under the Stored Communications Act. Appellant's motion to suppress the CSLI cited our state's statutory exclusionary rule, article 38.23(a) of the Code of Criminal Procedure, which, unlike the federal exclusionary rule, contains no good faith exclusion for evidence obtained without a warrant. *See also McClintock,* 541 S.W.3d at 67 n.4 ("Moreover, it seems plain enough that Article 38.23(b) does not provide a good faith exception for an illegal warrantless search . . . .").

error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Snowden v. State,* 353 S.W.3d 815, 817-18, 822 (Tex. Crim. App. 2011).

The constitutional harmless error analysis asks whether there is a reasonable possibility the error might have contributed to the conviction. *Love,* 543 S.W.3d at 846 (citing *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g)). Its focus is not on the propriety of the trial's outcome; rather, it aims to calculate as much as possible the error's probable impact on the jury in light of the existence of other evidence. *Id.* (citing *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). To that end, considerations include the nature of the error, the degree of its emphasis by the State, the probable collateral implications of the error, and the weight a juror probably placed on the error. *Love,* 543 S.W.3d at 846; *Snowden,* 353 S.W.3d at 822. But these considerations are not exclusive. *Snowden,* 353 S.W.3d at 822. "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* at 822 (bracketed text in original) (quoting TEX. R. APP. P. 44.2(a)). For this purpose, we must evaluate the entire record in a neutral manner rather than in the light most favorable to the prosecution. *Love,* 543 S.W.3d at 846.

The record of the trial is complex. The jury heard over 16 days of testimony. Combined, the prosecution and defense presented testimony from 60 witnesses, and some 1,800 exhibits were admitted.

We begin with a description of the nature of the error we evaluate. *Love,* 543 S.W.3d at 846. As noted, because appellant's CSLI was not suppressed, the jury saw evidence it should not have seen.

Appellant's historical cell site location information, derived from AT&T's records, was a part of the extensive cell phone record evidence the State used to show the contacts, by phone call and text message, between Shepard and appellant before and after Sonnier's murder. In particular, appellant's AT&T CSLI depicted appellant's location, based on his cell phone's contacts with cell towers, at what the State contended were critical times.

Using Shepard's Sprint cell phone records and appellant's AT&T records, Lubbock police Corporal Darren Lindly gave expert testimony at trial. Lindly was on the stand for much of a day's testimony. His testimony demonstrated the extent of the contacts that occurred between Shepard and appellant on days Shepard was in Lubbock. As examples, summarizing the information he had compiled, Lindly told the jury he counted 19 text messages and nine calls between the two on May 15; 31 texts and nine calls on May 16; 38 texts and four calls on May 17; 27 texts and one call on June 6; 41 texts and three calls on June 12; and 65 texts and 11 calls on June 14. On the day of the murder, July 10, there were, Lindly said, 37 texts and four calls between the two, and on July 11, 21 texts and no calls.[17]

---

[17] Lindly's testimony showed appellant to be a prolific user of text messages. He said, for instance, that on July 10 appellant sent a total of 242 text messages, of which the 37 texts exchanged with Shepard amounted to roughly 15 percent.

Lindly's testimony was supported with a slide presentation containing Google Earth satellite views of Lubbock, Amarillo, and points along the connecting Interstate Highway 27. Lindly explained how he plotted the cell tower location information for phone calls[18] made between Shepard and appellant. Relying on appellant's AT&T CSLI, and CSLI from Shepard's Sprint account,[19] he placed pins on the slides designating Shepard's and appellant's locations on various dates and times when their cellphones contacted cell towers.

The information was depicted in State's exhibit 1757. The exhibit contains satellite maps on which Lindly placed pins indicating the locations of cell towers in Lubbock and in Amarillo. The Amarillo map also contains icons designating appellant's house, appellant's medical office, Shepard's apartment, and the pawn shop where Shepard sold the silver bars. The Lubbock map marks the locations of Sonnier's house, Shetina's house and the D'Venue dance studio. After those two maps, the exhibit contains maps and records pertaining to calls made by appellant or Shepard on seventeen days between March 12 and July 11, 2012. For each of the seventeen dates, the exhibit contains one or more pages of phone records and one or more maps depicting Lindly's estimate of a phone's location at the time of the call, relative to the cell tower shown on the record for each call. In total, the exhibit contains 67 satellite maps of areas in or between Lubbock

---

[18] Describing his review of the cell phone records, Lindly said, "The records show the tower that is being used by the phone." He explained that the records identify the cell tower a phone contacts when it is used in a phone call, but not when it is used in a text message. The records, however, identify the date and time text messages were exchanged, so the parties' locations can be inferred if phone calls and text messages are exchanged near the same time.

[19] Appellant's challenge to admission of CSLI is limited to his information obtained from AT&T. The admissibility of Shepard's Sprint records is not contested.

and Amarillo, and 55 pages of cell phone records from which Lindly derived the information to support the locations he plotted on the maps.

Of the 55 pages of cell phone records in State's exhibit 1757, only four were of appellant's AT&T records; the remaining 51 pages were of Shepard's Sprint records. The AT&T records were for calls occurring on March 12 and June 15. Of the 16 maps reflecting calls on March 12, eight contained plots of information from appellant's AT&T records. Two of the five maps depicting June 15 calls contained plots of AT&T information.

The State's use of appellant's CSLI focused primarily on his location on March 12. Addressing the emphasis placed on that evidence and its probable implications, the State's brief says appellant's CSLI "showed that Appellant and Shepard were together in Lubbock on March 12, 2012, which the State used to prove two points: that Shepard and Appellant were working closely together, and that Appellant was lying." We agree that the State used appellant's CSLI both as circumstantial evidence of his complicity in Sonnier's murder, and to impeach appellant's testimony.

The State's brief continues: "The focus of the CSLI presentation was unquestionably Shepard's location during the months preceding the murder. The State presented evidence of Shepard making frequent trips to Lubbock over the course of several months prior to July 2012. In Lubbock, Shepard would ping off cell towers close in location to [Shetina's] home, Dr. Sonnier's home, and the dance venue where Dr. Sonnier and [Shetina] met and continued to attend—D'Venue. The CSLI showed that on March 12, 2012, both Appellant and Shepard traveled to Lubbock, and were pinging off the same or similar towers around the same general times. The cell tower that Appellant

24

and Shepard hit most frequently was the one near the D'Venue dance studio. Later in the evening, Appellant and Shepard hit the same towers traveling back to Amarillo."[20]

The State contends admission of appellant's CSLI was harmless, even under the constitutional standard. The State first argues that appellant's own evidence established the same facts regarding his presence in Lubbock on March 12 as were shown by his CSLI. To support the statement, the State relies on Defendant's exhibit 116, a list of gasoline purchases appellant prepared from his credit card statement. The list contains a March 12 gas purchase at a station in Plainview, Texas. That appellant bought gas in Plainview might suggest he traveled to Lubbock, but it does not alone prove it. And, as the State's brief acknowledges, appellant denied he was with Shepard. Appellant's purchase of gas in Plainview, even accompanied by his later admission he was in Lubbock on that day,[21] says nothing about contact with Shepard. As showing the two were together in Lubbock that day, appellant's evidence does not carry nearly the probative value of the satellite map depicting his whereabouts, and Shepard's, near a location associated with Sonnier and Shetina. We can see no merit in the State's contention appellant's gas purchase record is the evidentiary equivalent of his CSLI.

---

[20] We have omitted the record references in our quotation from the State's brief.

[21] On cross examination, asked where he went on March 12, appellant said, "It appears now that I came to Lubbock." He elaborated, "[I] didn't remember that before until I saw the cell phone records. I still don't remember that trip to Lubbock, but my cell phone says I was in Lubbock, so I believe I was." Under continued cross examination, he acknowledged the CSLI showed his cell phone and Shepard's "hit two or so of the same towers in Lubbock," and agreed "then coming home you're hitting the same towers around Abernathy and New Deal . . . ." He asserted, though, the men "weren't together," and said their apparent presence near the same towers "would have to be a coincidence."

The State next contends the fact appellant and Shepard were working closely together prior to the murder was well shown by other evidence, making it unlikely the jury assigned significant weight to the erroneously-admitted CSLI. We find the contention improperly minimizes the significance of the CSLI evidence, for two general reasons.

First, while witness testimony, and evidence of text messages and phone calls exchanged between Shepard and appellant established without question that the two communicated often regarding Shepard's activities, the March 12 CSLI evidence is unique. By means of that evidence, the State's brief acknowledges, the jury was presented the implication that "[a]ppellant was physically with Shepard."

Nonetheless, the State argues, the evidence appellant "may have been in Lubbock with Shepard four months prior to the offense," told the jury only what they already knew, "that Appellant and Shepard were working closely together to track Dr. Sonnier's movements." The question, the State argues, "was always for *what purpose* they were tracking Dr. Sonnier's movements."[22] But our review of the evidence indicates that, absent the CSLI, there was no evidence appellant ever was in Lubbock with Shepard for *any* purpose. That Lindly's satellite maps prepared with the AT&T CSLI placed the two near identified locations associated with Sonnier and Shetina adds to its importance.

The State makes the point that appellant's presence in Lubbock was in March, four months before the murder. But given the undisputed evidence that appellant and Shepard discussed and carried out surveillance of Sonnier over a several-month period, we do not consider it significant that their joint presence in Lubbock occurred then rather

---

[22] Italics in original.

than closer to Sonnier's murder. The State's evidence that Shepard and appellant attempted to initiate their Plan B during March shows they were actively pursuing the plans to influence Sonnier's relationship with Shetina at that time.

Secondly, not only was the appellant's cell tower location information the only evidence that appellant was ever in Lubbock with Shepard, contrary to his denial before the jury, it appeared in a form likely to have a strong impact on jurors. *See Coble v. State,* 330 S.W.3d 253, 281 n.77 (Tex. Crim. App. 2010) (quoting John W. Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form,* 71 OR. L. REV. 349, 361 n.81 (1992) ("There is virtual unanimity among courts and commentators that evidence perceived by jurors to be "scientific" in nature will have particularly persuasive effect"); *Bagheri v. State,* 119 S.W.3d 755, 764 (Tex. Crim. App. 2003) (noting "the powerful persuasive effect that 'scientific' evidence has on the average juror").

Lindly acknowledged on cross examination that his plottings of Shepard's and appellant's locations involved some "guesstimating." But the satellite maps before the jury depicted no guesswork; appellant's location on each map was pinpointed and labeled with the date and time from the cell phone records, down to the second. And, even if the pinpoint depicted was inaccurate, the point still was made that appellant was present in Lubbock on that day and was at least in the vicinity of Shepard and the dance studio. Even appellant, on cross examination, was forced to acknowledge that the cell phone records disproved his statement he had not been in Lubbock.

We think the State correctly identifies an issue that was critical for the jury's resolution in the question "for *what purpose"* appellant and Shepard "were tracking Dr.

Sonnier's movements." We think the State also accurately summarizes the evidence when its brief further states, "Appellant admitted to working so closely with Shepard from the beginning, but offered an alternative story as to the motivation behind the ongoing surveillance of Dr. Sonnier." The State further, and accurately, notes that at trial and on appeal, appellant "proffered his own version of events to explain away the damning text messages and exchange of silver and cigars." The jury, the State argues, was "free to disbelieve any or all of Appellant's testimony and version of events." The argument highlights the second purpose for which the State used the evidence derived from appellant's CSLI, to show that "Appellant was lying."

At trial, appellant consistently denied he ever had been together with Shepard in Lubbock. After seeing the State's CSLI evidence, he acknowledged he had been in Lubbock on March 12, but he continued to deny he had been there with Shepard. The State made strong use of the AT&T CSLI evidence to argue that, in the denial, he was lying to the jury.

Again minimizing the importance of the CSLI, the State argues appellant's credibility before the jury "was damaged from the outset by other means." The State points to appellant's deceptive failure to mention his friendship with Shepard during his initial interview by Johnson, his statement on that occasion that he did not know anything about Sonnier, and his feigned surprise that he was being contacted about the murder.

In his testimony, appellant acknowledged his untruthful statements to Johnson but attributed them to his fear that the camera he believed Shepard had installed would be "traced back" to him and he would be "drawn into" the investigation of a murder he had no part in.

Contrary to the State's position on appeal, we find Lindly's satellite map evidence, created partly by use of appellant's AT&T CSLI, formed a main pillar supporting the State's argument to the jury that appellant could not be believed.

As noted, on the witness stand, appellant acknowledged he lied in his first conversation with Johnson, but explained his reasons for doing so. Appellant's denial he was present in Lubbock with Shepard, by contrast, was made directly to the jury, and gave the State the opportunity to emphasize its impact on his credibility.

In arguments to the jury, in its opening, the State emphasized the satellite maps depicting appellant's location on March 12. In the slide presentation that accompanied its argument, the State displayed six of the March 12 Google maps, five of them containing appellant's AT&T cell tower data. The State pointed the jury to appellant's denial that he "came to Lubbock with Shepard," and reviewed with the jury the cell tower evidence showing appellant's locations at various times on March 12, pointing specifically to his locations in the vicinity of the D'Venue dance studio. Concluding the argument focusing on that evidence, which occupied about a page of the reporter's record, the State asked, "Do you believe Dixon when he tells you that he was not in the Lubbock area with Shepard?"

> The State returned to the theme briefly in its closing argument, asking the jury:

> Is there any doubt in your mind now that Mike Dixon was with Dave Shepard on the D'Venue on the March the 12th? He looked you in the eye and said, "Nope, never been to Lubbock with Dave Shepard before." And we -- all these things hinge on the credibility of this Defendant.

In this court, the State argues it did not emphasize the evidence derived from appellant's CSLI.[23] The prominent place the State gave the evidence in its argument to the jury demonstrates otherwise.

We agree with the State's jury argument that much hinged on appellant's credibility. The jury's acceptance of appellant's assertion that his encouragement and direction of Shepard did not go beyond Plans A and B was essential to appellant's defense.

Appellant testified his intent was that Shepard obtain photographs of Sonnier in a compromising position, so appellant could demonstrate to Shetina that Sonnier was not the faithful friend she believed him to be. Appellant testified, "We were trying to get proof . . . about the fact that there was not a committed relationship that I had been told all about." Asked what he did when Shepard "told you that he could prove that Joseph Sonnier was not what people thought he was, what did you do?" appellant responded, "I told him, 'Yeah, get – I'd like to see that proof.'"

The text messages in evidence, on which the State relied heavily, reflect that appellant advised, encouraged, and directed Shepard to carry out a plan, but do not expressly make clear what plan is referred to. No text message in evidence refers directly to any intention to harm or kill Sonnier or even to confront him physically. At the same

---

[23] The State argues also that the jury likely assigned little weight to the evidence appellant was in Lubbock on March 12 while Shepard also was there because it was not probative of any element of the offense. We disagree with that assertion; the jury well could have seen it as evidence appellant encouraged, directed, aided, or attempted to aid Shepard to commit the offense, proof of which was essential to appellant's conviction under count two.

time, no text in evidence refers expressly to photographs or cameras. From our review of the text messages, we find a rational juror could read them as reflecting appellant's encouragement of Shepard to complete Sonnier's murder, or could read them as reflecting his encouragement of the plan appellant described.[24]

In like fashion, appellant's testimony, if believed, provided a counter to other significant pieces of the State's case. Appellant said the three bars of silver were his contribution to the formation of Shepard's corporation, PASI. The corporation's records in evidence show it was organized during May and June of 2011, with three shareholders, Shepard, appellant, and Kevin Flemming. Appellant's share certificate is dated June 9, 2011. Flemming testified to the corporation's formation, and said he funded the corporation's expenses for ten to twelve months, including, on occasion, Shepard's gasoline expenses for his travel to Lubbock to solicit physicians, until Shepard was arrested.

With regard to the pistol, appellant did not deny that the pistol retrieved from the lake belonged to him, but he testified Shepard knew where he kept it and, appellant believed, "at some time he took it from my house." He flatly denied he ever gave Shepard a gun.

The State adduced evidence of the effort, sometimes referred to as "Plan B," by which Shepard, with appellant's urging, asked two Amarillo women to contact Shetina in

_____

[24] The State urged the jury to view appellant's use in the text messages of phrases such as "put it on 'em," "get 'er done," and "whip and spur," as encouragement of violence. Appellant attributed his use of such phrases to his rural upbringing, and introduced evidence that he commonly used those phrases in communications with his family members and friends.

an effort to disrupt her relationship with Sonnier. One testified Shepard "wanted me to contact [Sonnier's] girlfriend at the time and basically try to get them to break up." She identified a text message she received from Shepard telling her he needed "help with a revenge issue." The text was dated March 12, 2012, the same day the cell tower evidence showed Shepard and appellant together in Lubbock. Texts between appellant and Shepard on March 13 and days following demonstrated appellant's interest in Shepard's effort. The other woman testified Shepard "wanted to give me an anonymous prepaid phone to call an ex-girlfriend of Dr. Dixon's and tell her that I was having sex with her boyfriend . . . for money." Shepard told her he was doing "a favor" for Dr. Dixon, and offered her "[a] few hundred dollars" to make the call.[25] Neither woman agreed to Shepard's request.

Such elaborate efforts to diminish Sonnier's standing with Shetina would have been unnecessary, of course, if the plan were simply to kill him. During his testimony, appellant acknowledged he met with and encouraged Shepard in his efforts to obtain photographs of Sonnier with other women. But he steadfastly denied asking Shepard to engage in any confrontation with Sonnier. He later told the jury that he never "in his wildest dreams" thought any harm could come to Sonnier from his activities.

At trial, appellant tried in other ways to blunt the effect of Reynolds' testimony that Shepard directly implicated appellant in the murder. Appellant strongly attacked Reynolds' credibility. He adduced and emphasized evidence that Shepard implicated

---

[25] In his testimony, appellant described Plan B somewhat differently. He said he understood Shepard was going to have the women "[e]ither take pictures with Dr. Sonnier, to act like they were his girlfriend, or to actually show up at his house to knock on the door to say, you know, while he was there with someone to say, 'Oh, I'm here. I didn't realize you were with someone.'"

Reynolds in the murder. Reynolds acknowledged under cross examination that Shepard "said I helped him."

Reynolds' testimony also was a mixed bag for the parties. Reynolds testified he considered Shepard a "psych case," mentally unstable, "out in left field." Though he testified Shepard told him appellant paid him to kill Sonnier, he also said Shepard lived in a "fantasy world." Reynolds told the jury Shepard had said he had a "hit list" of 40 to 50 names; had said he had helped kill his own mother by overdosing her with insulin; and had said he had killed others, including a homeless man. Reynolds testified he initially did not believe Shepard when he said he had killed a man in Lubbock, and that he did not believe Shepard's statement that he had tried to commit suicide until Shepard showed him the sliced wrist that appellant had sutured. Reynolds also acknowledged before the jury that he was aware Shepard since had repeatedly said appellant did not pay him for a murder.

The State presented Shepard's statements implicating appellant, through the testimony of Reynolds and Johnson,[26] and implicitly through Shepard's nolo plea and conviction, and presented a slew of incriminating circumstances. Appellant's case depended on the jury's rejection of Shepard's statements and its acceptance of appellant's explanation of the incriminating circumstantial evidence. The State argued before the jury that appellant's explanations were not credible. Its contention that appellant lied during his testimony formed a significant part of that argument, and the

---

[26] Shepard's daughter Haley Shepard also testified. She told the jury her father paid cash for presents and dinner for her and her sisters on June 16, 2012. When she asked him "how he was able to spend so much money for the weekend," she said he responded, "I did some work for [appellant] and he paid me early." He also told them, she said, that they should not ask what kind of work he had done.

33

AT&T CSLI was the vehicle to demonstrate appellant's lie. We have reviewed the entirety of the evidence in a neutral light. Having done so, we cannot say that beyond a reasonable doubt the erroneous admission of appellant's cell tower location information did not contribute to his conviction. *See* TEX. R. APP. P. 44.2(a); *Snowden,* 353 S.W.3d at 817-18, 822. Appellant's issues 43-47 are sustained.

**Exclusion of Public from Courtroom – Issues 11 through 16**

Through issues 11-16 appellant complains the trial court unlawfully excluded the public from his trial on three occasions.

On the first occasion, bailiffs excluded a sketch artist during voir dire, telling him there was no room for him in the courtroom. Before jury section resumed the next morning counsel for appellant objected to the artist's exclusion claiming denial of the right to a fair and public trial and citing *Presley v. Georgia,* 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010) (per curiam). The trial court explained it permitted the artist to sit in the jury box when the court became aware there was not space for him elsewhere in the courtroom. The court denied appellant's motion for a mistrial.

The second exclusion alleged took place during the testimony of a detective when tensions arose between appellant's counsel and the State's attorneys. The trial court released the jury for the day and stated to the gallery, "Everybody—if everybody would please excuse yourself from the courtroom except for the attorneys." Counsel for appellant again objected under *Presley*. During the following conference between the court and counsel, one of appellant's attorneys stated "about 50 people" were excused from the gallery and were not present for the conference. He added, "[A]ll of the public

34

has been excused." The State countered in its brief, "several spectators remained in the courtroom." In its later findings, the trial court found, "spectators remained in the courtroom."

The third claim of unlawful closure occurred the morning of closing arguments. The wife of one of appellant's attorneys testified at the motion for new trial hearing that she, along with "four or five" others, was barred from the courtroom by deputies and "several other people." According to her testimony a deputy said, "'He doesn't want anyone standing.'" She added, "And there—I looked in and there were empty spots." "There were places that people could sit down." The witness added she was kept from the courtroom for fifteen to twenty minutes. An attorney testified she tried to enter the courtroom about 9:30 or 9:45 a.m. but was told by a deputy sheriff she could not enter "because it was sitting room only." She later entered the courtroom during a break after a spectator departed. The deputy in charge of courthouse security testified he contacted the trial court judge in the interest of public safety and it was decided "sitting room only" would be permitted for closing arguments. Once the courtroom was full, according to the deputy, admission was allowed only when a seat became available. The deputy acknowledged the county's central jury room is larger than the trial courtroom and was vacant three days a week. He further acknowledged it was not equipped for jury trials.[27]

---

[27] The State argues appellant failed to raise timely objections to the exclusion of the sketch artist during voir dire and the exclusion of spectators during closing argument, and thus forfeited his closed-courtroom complaints on those occasions. "[A] complaint that a defendant's right to a public trial was violated is subject to forfeiture." *Peyronel v. State,* 465 S.W.3d 650, 653 (Tex. Crim. App. 2015). In support of its argument, the State cites *Suarez v. State,* No. 10-14-00218-CR, 2015 Tex. App. LEXIS 10874, at *1-3 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.) (not designated for publication), in which the court found a public trial complaint was forfeited. That case is distinguished from the present case by the court's observation that the defendant there "did not press the issue

The Sixth Amendment to the United States Constitution guarantees an accused the right to a public trial in all criminal prosecutions. U.S. CONST. AMEND. VI; *Lilly v. State,* 365 S.W.3d 321, 328 (Tex. Crim. App. 2012). The Fourteenth Amendment extends this fundamental right to defendants in state criminal prosecutions. U.S. CONST. AMEND. XIV; *Herring v. New York,* 422 U.S. 853, 857, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) (citing *In re Oliver,* 333 U.S. 257, 266-67, 68 S. Ct. 499, 92 L. Ed. 682 (1948)). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia,* 467 U.S. 39, 46, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (citations and internal quotation marks omitted). "'[A] presumption of openness inheres in the very nature of a criminal trial under our system of justice.'" *Lilly,* 365 S.W.3d at 328 n.6 (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 573, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)). "This presumption that criminal trials should be public, absent an overriding interest, reflects our country's basic distrust of secret trials and the belief that "justice must satisfy the appearance of justice." *Id.* (quoting *In re Oliver,* 333 U.S. at 268 and citing *Offutt v. United States,* 348 U.S. 11, 14, 75 S. Ct. 11, 99 L. Ed. 11 (1954)).

---

and request a mistrial or any other relief for an alleged violation of his Sixth Amendment right to a public trial." 2015 Tex. App. LEXIS 10874, at *3. Here appellant objected to the exclusion of the sketch artist and then moved for a mistrial which was denied. His objection to exclusion of spectators from closing argument was raised in a motion for new trial. In a supporting affidavit, one of his attorneys stated he learned of the exclusion, "after the trial." The State does not point us to, and we do not find, facts in the record tending to indicate that appellant's complaints of the first and third closures were not made at the earliest possible opportunity. *See Woods v. State,* 383 S.W.3d 775, 780 (Tex. App.—Houston [14th Dist.] 2012, pet. refused) (complaint at earliest possible opportunity "arises as soon as the error becomes apparent such that the party knows or should know that an error has occurred"). We find appellant preserved his closed-courtroom complaints by timely objection.

The Sixth Amendment right to a public trial extends to voir dire, *Presley,* 558 U.S. at 213, and closing argument. *People v. Woodward* (1992) 4 Cal.4th 376, 382-83 [14 Cal.Rptr.2d 434, 841 P.2d 954].

"[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller,* 467 U.S. at 45. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.*

The "standards for courts to apply before excluding the public from any stage of a criminal trial," the Court later held in *Presley*, require:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Presley,* 558 U.S. at 213-14 (quoting *Waller,* 467 U.S. at 48); *see Steadman v. State,* 360 S.W.3d 499, 504 (Tex. Crim. App. 2012) (applying standard).

The "presumption of openness," the Court said in *Waller*, "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." The required findings must be "specific enough that a reviewing court can determine whether the closure order was properly entered." *Waller,* 467 U.S. at 46 (quoting *Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.,* 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)).

In this court, the State does not take the position that the trial court never actually closed the courtroom. *See Lilly,* 365 S.W.3d at 331-32 (burden on defendant to show trial was closed to the public). The State instead argues the record reflects only partial closures. *See Steadman,* 360 S.W.3d at 505 n.19 (pointing out some state and federal courts have distinguished between partial and total closures of the courtroom); *Woods,* 383 S.W.3d at 781 (excluding a specific person or group, even if only temporarily, constitutes a partial closure) (citing *Douglas v. Wainwright,* 739 F.2d 531, 532 (11th Cir. 1984)). Accordingly, the State argues, the three partial exclusions of the public from the courtroom may be justified on a showing they were supported by a "substantial reason," a less stringent requirement than the "overriding interest" required by *Waller. Steadman,* 360 S.W.3d at 505 n.19.

We need not consider whether a substantial reason supported the exclusions of the public reflected by the record, because as the court pointed out in *Steadman*, even when the "substantial reason" standard applies, the trial court must satisfy the fourth requirement set out in *Waller* by making findings adequate to support the closure. *See Waller,* 467 U.S. at 46; *Steadman*, 360 S.W.3d at 505 n.19 (citing *Commonwealth v. Cohen*, 456 Mass. 94, 113, 921 N.E.2d 906, 922 (2010) for proposition that even in partial closure context remaining *Waller* factors must be satisfied); *Lilly,* 365 S.W.3d at 329 ("findings by the trial court are the linchpin of the *Waller* test").

The appellate record contained no findings supporting exclusion of members of the public from the courtroom. We abated the appeal and remanded the cause for preparation of those findings. The trial court prepared and filed findings and we quote them here in full:

38

1. At both trials, the Court quickly became aware that due to trial publicity, a larger courtroom would be needed. The Court moved the trial to the largest courtroom in the Lubbock County Courthouse-the 72nd District Court (capacity of ninety eight [98] without added seating as compared to sixty [60] in the 140th District Court).

2. At both trials, special accommodations were made to seat the Defendant's parents, Mary and Perry Dixon, in the courtroom despite limited seating. Even though the courtroom was full for the voir dire examination with potential jurors, the Court made seating available for Defendant's parents on the side of the audience.

3. On the first day of jury selection on October 21, 2015, the Court was unaware that sketch artist Roberto Garza was excluded from the courtroom. Immediately upon learning this information, the Court invited Mr. Garza to sit in the jury box to observe voir dire.

4. Near the halfway point of the trial, the Court found it necessary to admonish counsel for both sides on appropriate courtroom decorum, and excluded all spectators from the courtroom to do so. Nonetheless, spectators remained in the courtroom.

5. During closing arguments, the courtroom was filled to capacity with spectators. Any regulation of entrants into the courtroom was done for safety reasons, to maintain courtroom decorum, and to minimize juror distraction.

The trial court's findings, issued after our abatement of the appeal and remand for that purpose, are entirely inadequate to support even partial closure of the courtroom on any of the three occasions. The findings are particularly inadequate with regard to the occasion on which, as the findings describe it, "the Court found it necessary to admonish counsel for both sides on appropriate courtroom decorum, and excluded all spectators from the courtroom to do so." The findings identify neither an overriding interest nor a substantial reason for excluding the public from the courtroom on that occasion. Much less do they contain factual statements describing how allowing the public to remain in the courtroom would prejudice such an interest or reason, why the court's action caused a closure that was no broader than necessary, and why no reasonable alternatives existed. *See Lilly*, 365 S.W.3d at 329 (describing attributes of proper findings, citing

*Presley*, 130 S. Ct. at 725). As the court further held in *Lilly*, the law's "exacting record requirements stem from the fact, at least in part, that the trial court itself may sua sponte close the proceedings, rather than relying on the State or the defendant to move to close the trial." *Lilly*, 365 S.W.3d at 329. The trial court's action here illustrates the point made in *Lilly*.

The trial court's findings with regard to the third partial closure, that occurring during closing arguments, identify the court's reasons for regulating entrance into the courtroom as for "safety reasons, to maintain courtroom decorum, and to minimize juror distraction." But the court found no specific facts justifying closure because any of these interests would likely be prejudiced. Courtroom safety or security is a legitimate interest that may authorize closure under some circumstances. *Steadman,* 360 S.W.3d at 508. On a proper factual showing, maintaining courtroom decorum and minimizing juror distraction might support closure. But case law is clear that findings must express more than generic concerns. *See Lilly*, 365 S.W.3d at 329; *Steadman,* 360 S.W.3d at 506. Here there are no specific findings of fact describing how the court's stated reasons would be affected absent closure, why the court's closure was no broader than necessary to protect safety, maintain decorum, and minimize juror distraction, why no reasonable alternatives existed. *Lilly*, 365 S.W.3d at 329. The same can be said for the exclusion of the sketch artist in the first occasion described in the court's findings. The court makes the point it was unaware of his exclusion from the courtroom. That factor is not relevant to the determination whether the courtroom was in fact closed. *Woods,* 383 S.W.3d at 781.

"Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley*, 558 U.S. at 215; *Steadman*, 360 S.W.3d at 505 (quoting *Presley*). Excluding members of the public from the courtroom requires a balancing of interests "struck with special care" and the trial court bears the burden of considering reasonable alternatives to closure of the courtroom. *See Steadman*, 360 S.W.3d at 505 (citations omitted). The court must make findings adequate to support closure of the courtroom. *Id.* The trial court did not do so in this case.[28]

Given the record before us, we must find appellant's Sixth Amendment right to a public trial was violated. The violation of a defendant's public-trial right is structural error that does not require a showing of harm. *Waller,* 467 U.S. at 49-50; *Lilly,* 365 S.W.3d at 328 (citing *Johnson v. United States,* 520 U.S. 461, 468-69, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), and *Steadman,* 360 S.W.3d at 510. We sustain appellant's issues 11-16. For that reason also, appellant is entitled to a new trial.

## Conclusion

We have addressed the issues raised that are necessary to our disposition of the appeal. Tex. R. App. P. 47.1. Having overruled appellant's first and second issues on

---

[28] In his reply brief appellant argues we should not consider the trial court's findings, contending the procedure of issuing "post hoc" findings is inconsistent with *Waller* and not authorized by *Steadman*. In *Steadman*, the court was confronted with a similar argument regarding findings made after the court of appeals remanded the cause so the trial court could prepare *Waller* findings. *Steadman*, 360 S.W.3d at 503-04. The Court of Criminal Appeals held it need not consider the argument in view of its conclusion that a Sixth Amendment violation was shown, even considering the trial court's findings. *Id.* at 504. We likewise need not address appellant's reply-brief argument because the trial court's findings, made after we remanded the cause for their preparation, are not adequate to meet the law's requirements.

appeal, but sustained his issues numbered 43 through 47 and 11 through 16, we reverse

the trial court's judgments of conviction and remand the cause for a new trial.

<br>

James T. Campbell
Justice

Quinn, C.J., concurring in the result.[29]

Publish.

---

[29] Chief Justice Quinn joins the opinion of the majority as it addresses the disposition of the issues concerning the legal sufficiency of the evidence and the denial of the motion to suppress evidence only.  He concludes those issues are dispositive of the appeal and none other need be addressed.